811 F.2d 1077
 AMERICAN HOME ASSURANCE COMPANY, Plaintiff-Counter/Defendant-Appellant,
v.
DYKEMA, GOSSETT, SPENCER, GOODNOW & TRIGG, and Northbrook
Excess and Surplus Insurance Company,
Defendants-Counter/Plaintiffs-Appellees.
 No. 85-3220.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 28, 1986.
Decided Feb. 3, 1987.
As Amended on Denial of Rehearing and Rehearing En Banc May 22, 1987.
 
 David F. Pardys, Conklin & Adler, Ltd., Chicago, Ill., for plaintiff-counter/defendant-appellant.
 Arthur L. Klein, Arnstein, Gluck, Lehr, Barron & Milligan, Chicago, Ill., for defendants-counter/plaintiffs-appellees.
 Before CUDAHY, FLAUM and RIPPLE, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 American Home Assurance Company ("American Home") brought this action for a declaratory judgment, 28 U.S.C.A. Secs. 2201 et seq. (West Supp.1986), to determine: (1) the extent to which Dykema, Gossett, Spencer, Goodnow & Trigg ("Dykema"), a law firm, is entitled to insurance coverage by American Home for certain claims made against it; and (2) the extent to which any payments in settlement of these claims, as well as other expenses associated with the litigation, should be apportioned between American Home and Northbrook Excess and Surplus Insurance Company ("Northbrook"), a subsequent insurer of Dykema. Dykema and Northbrook counterclaimed, seeking, inter alia, a declaration that American Home was obligated to satisfy all of the claims. On cross-motions for summary judgment, the district court ruled that American Home was obligated to pay the full amount necessary to satisfy the claims against Dykema as well as the attorneys' fees incurred by Dykema in connection with the claims. It also ruled that American Home was liable for prejudgment interest on the money it owed. We reverse the judgment of the district court as to coverage, affirm in part as to prejudgment interest and remand for further proceedings.
 
 I.
 
 2
 The undisputed facts relied upon by the district court in its opinion, American Home Assurance Co. v. Dykema, Gossett, Spencer, Goodnow & Trigg, 625 F.Supp. 1052 (N.D.Ill.1985) ("District Court Opinion") are as follows:
 
 
 3
 1. The Barker Litigation. Michigan Baptist Foundation, Inc. (the "Foundation") was incorporated by the Michigan Baptist Convention (the "Convention") for the purpose of building and operating a retirement village in Florida. In order to finance the project, the Foundation began in January 1974 to issue first mortgage bonds secured by its interest in the land and ongoing construction. In October 1976, Lee County Bank, the trustee for the bonds, refused to participate in further issues. The Foundation then sold unsecured note certificates until March 1978 when it was placed in receivership. See generally Barker v. Lee County Bank, 1985-1986 Fed.Sec.L.Rep. (CCH) p 92,404 (N.D.Ill.1985).
 
 
 4
 In March 1977, about four months after the Foundation had started selling the note certificates, Dykema was retained by the Convention to advise it about the Foundation's activities. A little over two years later, in May 1979, the Convention as well as other defendants were sued in the United States District Court for the Northern District of Illinois by a class of purchasers of the bonds and notes. In November 1979, Dykema was named a defendant in that lawsuit. The third (and last) amended complaint in that suit, filed in April 1980 and captioned Barker v. Lee County Bank, No. 79-C-2047 ("Barker "), charged all defendants with knowing participation in conduct resulting in the unlawful public sale of more than $7 million in mortgage bonds and notes issued by the Foundation between 1974 and 1978. Dykema's participation in the challenged offerings was described in paragraphs 66 through 82 of the complaint. Specifically, the complaint alleged:
 
 
 5
 Shortly after being retained by the Michigan Convention, Dykema Gossett was made aware of the grave financial and legal situation of the Foundation, of the Foundation's unlawful sale of its Note Certificates, First Mortgage Bonds and life care contracts, and of the fact that the legally required disclosures had not been made by the Foundation in connection with such sales.
 
 
 6
 Third Amended Complaint p 67, Appellees' Supplemental Appendix at 98. Subsequent paragraphs alleged actions in connection with the Foundation's activities undertaken in April through August of 1977 by Ronald Rose, a partner in Dykema.[1] Finally, it was alleged that "as late as the spring of 1978, when the Foundation's future was hopeless, attorney Ronald Rose urged and advised that the sale of the Note Certificates be continued." Id. at p 82.
 
 
 7
 Dykema was charged with aiding and abetting violations of section 10(b) of the Securities Exchange Act and rule 10b-5 (Count I) and with violating the Florida securities law (Count VI). Further charges alleged common law fraud and deceit (Count II); reckless or negligent misrepresentation (Count III); and professional recklessness or negligence (Count IV).
 
 
 8
 2. The Insurance. American Home issued to Dykema a professional liability insurance policy on August 19, 1976. The initial policy limit was $1 million; an endorsement dated January 12, 1977 raised the limit to $2 million. The policy read in pertinent part:
 
 
 9
 [American Home agrees] [t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any act or omission of the insured, or of any other person for whose acts or omissions the insured is legally responsible, and arising out of the performance of professional services for others in the insured's capacity as a lawyer provided one or more claims arising out of the same professional service are made ... against the partnership....
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 This policy applies to acts or omissions ... during the policy period....
 
 
 13
 American Home Policy p I (Coverage B), p V (Policy Period, Territory), Appellees' Supplemental Appendix at 16. American Home also undertook to "defend any suit against the insured alleging such act or omission and seeking damages which are payable under the terms of this policy...." Id. p II (Defense, Settlement, Supplementary Payments). This policy expired on August 19, 1977.
 
 
 14
 On August 19, 1979, two years after the expiration of the American Home policy, Northbrook issued Dykema a professional liability insurance policy that obligated Northbrook
 
 
 15
 [t]o pay on behalf of the Insured all sums in excess of the deductible amount stated in the Declarations which the Insured shall become legally obligated to pay as damages as a result of CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD:
 
 
 16
 (a) by reason of any act, error or omission in professional services rendered or that should have been rendered by the Insured or by any person for whose acts, errors or omissions the Insured is legally responsible, and arising out of the conduct of the Insured's profession as a lawyer....
 
 
 17
 * * *
 
 
 18
 * * *PROVIDED ALWAYS THAT such act, error or omission or such personal injury happens:
 
 
 19
 (a) during the policy period, or
 
 
 20
 (b) prior to the policy period provided that prior to the effective date of this policy:
 
 
 21
 * * *
 
 
 22
 * * *
 
 
 23
 (3) there is no prior policy or policies which provide insurance for such liability or claim. If coverage is otherwise afforded under this policy and if the available limits of liability of such prior policy or policies are insufficient to pay any liability or claim, this policy will be excess over any such prior coverage.
 
 
 24
 Northbrook Policy p I (Coverage), Appellees' Supplemental Appendix at 26. This policy was in force from August 19, 1979 to August 19, 1980.
 
 
 25
 When Dykema was served with the first amended complaint in Barker in November 1979, it immediately notified both American Home and Northbrook. American Home acknowledged this notice by letter dated December 6, 1979 and informed Dykema that the law firm of Hinshaw, Culbertson, Moelmann, Hoban & Fuller ("Hinshaw") would represent Dykema in that suit.[2] The December 6 letter also provided:
 
 
 26
 If through discovery and/or other procedures it becomes apparent that there are claims made against your firm which are not covered by your policies of insurance the American Home Assurance Company reserves its rights [sic] to set forth at a future time those claims and/or judgment rendered against you which are not covered by your insurance policy.
 
 
 27
 Appellees' Supplemental Appendix at 130. Six days later American Home reassigned the Dykema case to the law firm of Karon, Morrison & Savikas, Ltd. ("Karon"). Dykema did not retain separate legal counsel. It satisfied the $100,000 deductible and all other American Home policy requirements.
 
 
 28
 Two years later, in December 1981, American Home retained the law firm of Conklin & Adler, Ltd. ("Conklin") to review Karon's file on the Barker litigation.[3] In January 1982, not yet having seen either Karon's files or the policies at issue, Conklin advised American Home of its belief that there was "a serious question of policy period" in the Barker case. It based this comment on its "understanding of the general form which such policies take." It noted that Dykema was being sued for its activities between March 1977 and April 1978 and that American Home's policy expired August 19, 1977, concluding that some other policy "ought to at least contribute to the coverage of the alleged loss." Appellees' Supplemental Appendix at 197.
 
 
 29
 In February 1982, Conklin informed Karon that it had been retained by American Home to represent American Home's interests and that Karon should thereafter submit all reports concerning Barker to Conklin. In August 1982, Conklin met with Karon and for the first time raised with Karon the issue whether American Home's policy covered Dykema for the acts alleged in the complaint. On September 1, 1982, Conklin met with representatives of Dykema and Northbrook and for the first time directly revealed to them American Home's position that policy period limitations precluded, at least in part, coverage for Dykema's liability in Barker.
 
 
 30
 3. Settlement Opportunities. After Karon undertook Dykema's defense and prior to June 24, 1980, the Barker plaintiffs had offered to settle with some of the defendants, including Dykema, for $750,000. Karon reported the settlement offer to American Home and suggested that Dykema contribute approximately $100,000 to the settlement pool. American Home refused to grant settlement authority for more than $75,000, however, and this counter-offer was rejected by the plaintiffs. Five months later, the Barker plaintiffs offered to settle for $475,000 with Dykema alone. Karon sought from American Home settlement authority up to the sum of $250,000; once again, American Home refused to grant authority to settle for more than $75,000.
 
 
 31
 On July 23, 1982, an eighteen-month stay of discovery in the Barker case was lifted. Dykema wrote Conklin, urging it to start negotiations with the Barker plaintiffs immediately. The Barker plaintiffs made an offer to settle with Dykema only for $750,000. Karon advised American Home that, in light of Dykema's exposure to a multimillion dollar jury verdict, "efforts [should] be made to extricate Dykema for an amount up to the $750,000 demand." Appellees' Supplemental Appendix at 177. American Home did not respond to this settlement offer before it expired. On August 16, 1982, the Barker plaintiffs renewed this offer. At Dykema's request, Karon pursued negotiations. The claims against Dykema were ultimately settled for $612,500. American Home contributed half of this sum ($306,250) without prejudice to its right to contest coverage. Northbrook contributed the other half through a loan receipt agreement executed with Dykema. Finally, upon American Home's refusal and with leave of the district court in Barker, Dykema paid one-half of Karon's legal fees without prejudice to its right to seek reimbursement.
 
 
 32
 4. The Declaratory Judgment Action. On September 1, 1982, the same day that it had first informed Dykema of the coverage problem, American Home filed its complaint in this action. It sought a judgment declaring: (1) the extent to which Dykema was entitled to American Home's coverage for liability incurred in its representation of the Foundation; and (2) the extent to which any payments made to settle the claims against Dykema should be apportioned between American Home and Northbrook. Dykema and Northbrook counterclaimed, seeking, inter alia, a declaration that American Home was obligated to pay the full amount.
 
 
 33
 On cross-motions for summary judgment, the district court granted Dykema's and Northbrook's motion[4] and denied American Home's. In its memorandum opinion, it ruled that the American Home policy provided full coverage to Dykema for the amount of the Barker settlement. District Court Opinion, 625 F.Supp. at 1069. The district court held that American Home was barred, under principles of estoppel, from denying coverage to Dykema. Id. at 1063. The court also ruled that American Home must reimburse Dykema for legal fees that Dykema owed both Karon and Arnstein, Gluck, Lehr, Barron & Milligan ("Arnstein") for their work in connection with the Barker litigation, American Home Assurance Co. v. Dykema, Gossett, Spencer, Goodnow & Trigg, 625 F.Supp. 1069, 1070-71 (N.D.Ill.1985) ("Supplemental Opinion"), and that prejudgment interest was available to defendants under Michigan law, id. at 1075.[5]
 
 
 34
 American Home appeals, arguing: (1) it is not liable for any portion of the Barker settlement; or (2) under various theories of both policy interpretation and proration, it is liable only for a portion of the settlement, with Northbrook liable for the rest; (3) prejudgment interest should not have been assessed; and (4) it should not be liable for legal fees that Dykema owed Arnstein.
 
 II.
 
 35
 The district court ruled that American Home was estopped to deny coverage to Dykema[6] by its previous assumption of responsibility, upon which Dykema relied to its detriment; its "egregious" delay in informing either Karon, Dykema or Northbrook of its policy defense; and the overly-vague "reservation of rights" in the December 1979 letter. District Court Opinion, 625 F.Supp. at 1062-63. The district court also suggested that there is a question whether American Home should be estopped from passing any of the settlement costs to Northbrook; the court concluded, however, that it could not resolve this issue for a number of reasons: (1) neither party had cited any authority on this point; (2) the record was silent as to the notification American Home provided to Northbrook once American Home determined that its policy might not cover all of Dykema's liability; and (3) there was no evidence to establish that Northbrook relied to its detriment on American Home's conduct. Id. at 1065. American Home appeals the district court's ruling that it is estopped to deny coverage vis-a-vis Dykema. Appellant's Reply Brief at 1-3. Appellees question the district court's failure to rule that this estoppel also ran to Northbrook. Appellees' Brief at 33-34.
 
 
 36
 Under the district court's interpretation of the American Home policy, it did not have to reach the estoppel issue with respect to either Dykema or Northbrook. Since the district court found that the American Home policy provided Dykema with full coverage, there was no need for the court to rely on estoppel to extend the coverage which otherwise exists under the language of the policy.
 
 
 37
 We have concluded, contrary to the district court's findings, that American Home and Northbrook are both liable for a portion of the ultimate settlement under the terms of their policies. See infra p. 1087. Even under this interpretation of the policies, however, it is not necessary for us to determine whether or not American Home is estopped from denying full coverage to Dykema. The question whether American Home is estopped as against Dykema is relevant only if the American Home policy provided only partial coverage to Dykema and American Home was Dykema's sole insurer. We would then have to determine whether estoppel would operate to extend the coverage otherwise provided under American Home's policy. Since we have concluded that Northbrook's policy operates to pick up any liability excluded under American Home's policy, Dykema will be fully covered, either by both the American Home and Northbrook policies or by the American Home policy alone if American Home is estopped vis-a-vis Northbrook. Thus, the only estoppel issue we need consider is whether American Home is estopped from denying coverage as against Northbrook.
 
 
 38
 Dykema and Northbrook reiterate on appeal their argument that American Home is estopped to deny coverage if this would work to Northbrook's detriment as well as to Dykema's. Appellees' Brief at 33-34. We believe that the district court was correct in refusing to adopt this unprecedented expansion of the theory of estoppel. The Michigan law on which the court relied in holding that American Home was estopped to deny Dykema coverage is based upon the duties of loyalty and good-faith dealing that an insurer has toward an insured:
 
 
 39
 In no field of law is legal duty more rigidly enforced than in instances as at bar. The insurer must fulfill its policy-contracted obligation with utmost loyalty to its insured; not for the purpose of developing, secretly or otherwise, a policy defense. When a conflict of interest--even a mere possibility thereof--arises, the law suggests (if it does not require) that the insurer act promptly and openly, on peril of estoppel....
 
 
 40
 Meirthew v. Last, 376 Mich. 33, 38, 135 N.W.2d 353, 355 (1965).
 
 
 41
 On the other hand, the district court reasoned that the duty that a primary insurer owes an excess insurer is to settle within the policy limits if possible. Since the ultimate Barker settlement was well within the American Home policy limit, this duty was not breached. District Court Opinion, 625 F.Supp. at 1065. Further, the district court noted that there was no evidence in the record to suggest that Northbrook had in any way changed its position in reliance upon American Home's initial assumption of all liability. Id. We conclude, first, that it is quite unlikely that the courts of Michigan would extend the rule of estoppel announced in Meirthew to another insurer and, second, that the undisputed facts before the district court on the motions for summary judgment showed no detrimental reliance by Northbrook on American Home's assumption of Dykema's defense. Thus, the respective liabilities of American Home and of Northbrook to Dykema turn on the terms of their policies.
 
 III.
 
 42
 We now consider the liabilities of American Home and Northbrook under their insurance contracts with Dykema. The American Home policy covered Dykema for damages it might have to pay for any "act or omission ... during the policy period"--August 19, 1976 through August 19, 1977. The Northbrook policy covered Dykema for any "claims made" between August 19, 1979 and August 19, 1980, provided that if the "act, error, or omission" giving rise to the claim did not also occur within this policy period, the Northbrook policy would be excess over any other applicable insurance. Since the claims at issue here were brought during the Northbrook policy period, Northbrook must cover them only if American Home is not obligated to cover them under its policy.[7] Thus, the district court's general approach was correct: The first inquiry is whether the Barker claims are covered--in whole or in part--by the American Home policy.
 
 
 43
 The third amended complaint alleged that Dykema failed to disclose its knowledge that the Foundation was in a precarious financial position and that the investors were thus left uninformed of the riskiness of their investment. Because the case was settled before trial, these allegations are accepted as true for purposes of determining insurance coverage. The district court concluded that Dykema was liable for one continuous omission, relying on a line of cases that applied a "cause" test for determining what constitutes an "occurrence" under the limits of liability clause of an indemnity policy. See, e.g., Michigan Chemical Corp. v. American Home Assurance Co., 728 F.2d 374, 379 (6th Cir.1984) ("The vast majority of courts ... have concluded that ... the number of occurrences for purposes of applying coverage limitations is determined by referring to the cause or causes of the damage and not to the number of injuries or claims.") (citations omitted) (emphasis supplied). Since all of the injuries complained of by the Barker plaintiffs could be said to flow from the same cause--Dykema's failure to disclose the financial condition of the Foundation or to advise the Foundation to discontinue sale of the notes--the district court ruled that the continuing omission alleged was but one "occurrence." District Court Opinion, 625 F.Supp. at 1066-68.
 
 
 44
 After concluding that there was but a single occurrence, the district court then turned to the question of determining the policy period within which the occurrence fell. The court relied on a line of cases which held that "the determination of when an occurrence happens must be made by reference to the time when the injurious effects of the occurrence took place." District Court Opinion, 625 F.Supp. at 1068 (quoting Appalachian Insurance Co. v. Liberty Mutual Insurance Co., 676 F.2d 56, 61-62 (3d Cir.1982)). The court ruled that the injurious effects of Dykema's omission "occurred" when the first of the Barker plaintiffs purchased notes without a warning from Dykema--and continued thereafter. Thus, American Home's policy was read to provide coverage for the full amount of the settlement with the Barker plaintiffs.
 
 
 45
 We agree with American Home that the "cause" test used to interpret policy limitation of liability clauses (i.e., for determining whether there has been a single or multiple occurrence) does not control the present case. That test applies when the issue is how to construe the dollar limit on coverage. For example, if a malpractice insurer provides coverage for a physician for $200,000 "per occurrence," a court must determine whether continuous prescription of a drug over a two-year period constitutes one occurrence (with maximum coverage of $200,000) or as many occurrences as there were consultations and prescription refills (resulting in far greater total coverage). See, e.g., Aetna Casualty & Surety Co. v. Medical Protective Co., 575 F.Supp. 901 (N.D.Ill.1983). No such issue is presented here because the limits of American Home's coverage were more than enough to cover the entire Barker settlement.[8] Thus, the "single/multiple occurrence" distinction addresses aggregate coverage. But neither the district court nor the appellees have explained why it should govern the question whether damage incurred after the expiration of a policy is covered by that policy.[9] See Michigan Chemical Corp., 728 F.2d at 380-81 (distinguishing cases in which "[t]he primary issue ... was ... ascertaining the policy period to which claims would be assigned" from those cases which involved the question of the number of occurrences). Accord Appalachian Insurance Co., 676 F.2d at 61. Hence, there is no reason to apply the "cause" test here, and, instead, we shall address the question of when the alleged malpractice occurred.
 
 
 46
 The American Home policy provides coverage for any liability which the insured may incur "because of any act or omission of the insured ... arising out of the performance of professional services...." On appeal, the parties dispute whether an acts or omissions policy should be interpreted in the same manner as a policy which insures against "occurrences." The district court treated the American Home policy as an occurrence policy; the court stated that the "parties agree[d] that the American Home policy should be characterized as an 'occurrence policy.' " District Court Opinion, 625 F.Supp. at 1064. The court then applied a line of cases which held that the time of an occurrence is determined by the time of the injurious effects, and the court concluded that the Barker plaintiffs sustained their injuries during the American Home policy period:
 
 
 47
 The Barker plaintiffs were allegedly injured by Dykema, therefore, immediately after the law firm learned of material facts concerning the Foundation's legal and financial situation and failed to disclose that information to the proper parties. This alleged omission occurred, according to the Barker complaint, shortly after Dykema was retained by the Convention in March of 1977, i.e., during the period of American Home's insurance coverage.
 
 
 48
 District Court Opinion, 625 F.Supp. at 1068-69.
 
 
 49
 American Home, like the district court, argues that acts or omissions policies should be interpreted in the same way as occurrence policies and that both types of insurance contract require that the act or omission causing the harm and the injury occur within the policy period. Appellant's Brief at 2. Dykema and Northbrook, by contrast, contend on appeal that an "acts, errors or omissions" policy differs from an "occurrence" policy in that "injury during the policy period is not a prerequisite to coverage under the plain language of [an acts, errors or omissions] policy." Appellees' Brief at 23 n. 7 (emphasis in original).
 
 
 50
 We have found no case, and none has been cited to us, which supports the appellees' contention that injury need not occur during the policy period in order to trigger coverage under an acts or omissions policy. The case law instead supports the position of the district court and the appellant. The cases which we have found that interpret acts or omissions policies treat them like occurrence policies for the purpose of determining when coverage is triggered. See, e.g., Arant v. Signal Insurance Co., 67 Cal.App.3d 514, 516-18, 136 Cal.Rptr. 689, 690 (1977) (Court analyzed "act, error or omission" policy as an occurrence policy. "[T]he time of the occurrence of an accident within the meaning of an indemnity policy is the time that the damages insured against actually accrue.") (citation omitted) (emphasis in original); Phillips v. Transamerica Insurance Co., 107 Misc.2d 162, 165, 433 N.Y.S.2d 555, 557 (1980) ("[T]he occurrence form [of liability policy] affords coverage for acts or omissions arising from professional services which were performed during the term of the policy regardless of when the actual claim is asserted.") (citation omitted); Reliance Insurance Co. v. Arneson, 322 N.W.2d 604 (Minn.1982) (attorney's acts or omissions policy did not cover claim as damage did not occur until after expiration of policy); Annotation, Lawyers' Professional Liability Insurance, 84 A.L.R.3d 187, 190 (1978) ("The 'occurrence' policy affords the attorney coverage as to acts or omissions, occurring during the policy period, in the rendering of professional services as an attorney....").
 
 
 51
 While we have found no Michigan cases which deal with the issue whether injury must occur within the policy period to trigger coverage under an acts or omissions policy, the Michigan courts follow the majority rule that the "time when the complainant is damaged, rather than the time of the negligent act, is the point at which responsibility accrues under an indemnity policy." Employers Mutual Liability Insurance Co. v. Michigan Mutual Auto Insurance Co., 101 Mich.App. 697, 703, 300 N.W.2d 682, 685 (1980) (citation omitted). See also Allstate Insurance Co. v. Demps, 133 Mich.App. 168, 176-77, 348 N.W.2d 720, 724 (1984); Moss v. Shelby Mutual Insurance Co., 105 Mich.App. 671, 679, 308 N.W.2d 428, 432 (1981).[10] We must thus determine when the injury or injuries to the Barker plaintiffs occurred.
 
 
 52
 As noted, the district court concluded that the injury to the Barker plaintiffs occurred at a single point in time: "The Barker plaintiffs were allegedly injured by Dykema ... immediately after the law firm learned of material facts concerning the Foundation's legal and financial situation...." District Court Opinion, 625 F.Supp. at 1068. American Home, on the other hand, makes two alternative arguments as to when the damages occurred: (1) no injuries occurred during the term of its policy as the investors were not injured until either the date the securities were scheduled to mature, which took place in 1981 or thereafter, or March 31, 1978 when the Foundation announced that it would be suspending payments, Appellant's Brief at 8; or (2) an injury occurred each time a security was sold, in which case American Home and Northbrook would share the responsibility for Dykema's liability since notes continued to be sold after the expiration of the American Home policy, id. at 11-12.
 
 
 53
 The injuries did not all occur at the time Dykema first discovered information which bore on the value of the notes and bonds. This conclusion of the district court cannot stand given the fact that not all of the Barker plaintiffs had even purchased securities as of that time.
 
 
 54
 On the other hand, we reject American Home's contention that the maturity date of the securities marked the date of injury. To support its position, American Home relies primarily on Arizona v. Glens Falls Insurance Co., 125 Ariz. 328, 609 P.2d 598 (Ariz.App.1980). The plaintiffs in Glens Falls were persons who had deposited funds with two thrift associations; they sued the state of Arizona for improper regulation after the associations were forced into receivership. The state's insurance carriers claimed that, under the terms of their occurrence policies with the state, there was no coverage since the policies had lapsed before the associations actually went into receivership; the insurers' position was that the depositors had not actually been damaged until the associations entered receivership because it was only at that point that they were prevented from withdrawing their funds. The state claimed that the plaintiffs were injured as soon as they deposited funds with the institutions because the financial position of the associations was such that they could have been placed in receivership at least four years before the time receivership actually occurred. The Arizona appellate court agreed with the insurers. By analogy to Glens Falls, American Home argues that no actual damage occurred until the Foundation informed the investors that it was suspending payments or until the maturity date of the bonds and notes.
 
 
 55
 But we think Glens Falls is dubious authority because the depositors there actually suffered damage during the period when the associations were insolvent but had not yet entered receivership; the value of the deposits was reduced at the point the associations' liabilities exceeded their assets because then the depositors had no reasonable expectation of payment in full. Similarly, while the securities held by the Barker plaintiffs were not scheduled to mature until after the American Home policy had expired, the plaintiffs were undeniably injured at the time they bought notes and bonds worth much less than represented.[11] There was a separate such injury each time a note or bond was sold. Hence, American Home is liable for that portion of the settlement associated with the securities sold while its policy was in effect (from August 19, 1976 until August 19, 1977), and Northbrook's policy covers that part of the liability attributable to notes sold after August 19, 1977 for which claims were filed during the term of its policy.[12]
 
 
 56
 On remand, the district court should prorate the settlement costs between American Home and Northbrook based upon the relationship which the face value of the notes and bonds sold during the respective policy periods bears to the total face value sold. We reject American Home's suggestion that proration be based upon the limits of liability provided by the two policies. Appellant's Brief at 22-24. American Home's policy provides for this method of proration only "[i]f the insured has other insurance against a loss covered by this policy...." American Home Policy (Conditions p 6), Appellees' Supplemental Appendix at 17. This provision is not applicable here since Northbrook's coverage is excess; thus, Dykema does not have any "other insurance" which provides coverage concurrent with that of American Home. We therefore reverse and remand with respect to this branch of the case. Liability is to be allocated as we have indicated and damages recomputed.
 
 
 57
 American Home contends that Dykema's attorneys' fees should also be prorated between itself and Northbrook. The American Home policy and the Northbrook policy both provide that, with respect to the insurance afforded under each policy, the insurer will bear the cost of defending the insured. See American Home Policy p II (Defense, Settlement, Supplementary Payments); Northbrook Policy p 2 (Defense, Settlement), Appellees' Supplemental Appendix at 16, 26 respectively. While Northbrook's insurance contract obligates it to pay some of Dykema's legal expenses, we find that it would be inequitable to apportion Dykema's legal fees between the two insurers in the same ratio as that applied to the actual settlement figure. The district court found that American Home's obstructionist conduct forced Dykema to retain a second law firm, Supplemental Opinion, 625 F.Supp. at 1070; American Home's refusal to grant Karon realistic settlement authority also prolonged the settlement negotiations, District Court Opinion, 625 F.Supp. at 1058-59. In apportioning Dykema's legal expenses on remand, the district court should not require Northbrook to bear any part of these expenses which it may determine were incurred as a result of American Home's improper or obstructionist conduct.
 
 IV.
 
 58
 American Home also challenges the assessment of prejudgment interest against it. The district court assessed interest on the amount Northbrook contributed to the settlement, on the legal fees paid by Dykema to Arnstein and Karon in connection with the Barker litigation and on that portion of Karon's fees incurred in its work on the Barker suit which remains unpaid. American Home contends that the district court: (1) erroneously concluded that Michigan law, rather than Illinois law, controls the issue of prejudgment interest, (2) incorrectly interpreted the Michigan statutory prejudgment interest provisions and (3) improperly awarded prejudgment interest on Karon's unpaid fees. We find that the district court properly applied Michigan law. The court erred, however, in awarding interest on Karon's unpaid fees and in awarding the fees and interest jointly to Dykema and Karon, a nonparty.
 
 
 59
 Federal courts sitting in diversity cases apply the conflict rules of the forum state, which in this case is Illinois. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); SCA Services, Inc. v. Lucky Stores, 599 F.2d 178, 180 (7th Cir.1979). The district court concluded that a party's entitlement to prejudgment interest, in the absence of a contractual provision to the contrary, is governed by the law of the state which governs the interpretation of the contract in question. Supplemental Opinion, 625 F.Supp. at 1075 (citing SCA Services, 599 F.2d at 180). The district court held that Michigan law controls the award of prejudgment interest in line with its determination that that law controls the interpretation of the American Home insurance policy.[13] On appeal, American Home contends that reliance on SCA Services is misplaced since the choice of law determination in that case was based upon an express contractual choice of law provision. Appellant's Brief at 26. Lacking such a provision here, American Home argues that the issue of prejudgment interest must be decided by reference to the law of Illinois, the forum state. In support, American Home cites cases which hold that the availability of postjudgment interest is determined by the law of the forum state. See Schoenfeld v. Neher, 453 F.2d 896 (10th Cir.1972); Coleman v. Quaker State Coca-Cola Bottling Co., 331 F.Supp. 785 (E.D.Pa.1971).
 
 
 60
 In fact, there is a split of authority on the choice of law issue with respect to prejudgment interest: Some jurisdictions consider prejudgment interest to be part of the contract damages and thus apply the same law to both questions, while others associate prejudgment interest with costs and attorneys' fees, which are governed by the law of the forum. Compare Entron, Inc. v. Affiliated FM Insurance Co., 749 F.2d 127, 131 (2d Cir.1984) ("under New York choice of law principles, the allowance of prejudgment interest is controlled by the law of New Jersey, whose law determined liability on the main claim") (citations omitted) with F.E. Myers Co. v. Pipe Maintenance Services, Inc., 599 F.Supp. 697, 704 (D.Del.1984) ("the law of the forum state, Delaware, relating to prejudgment interest applies in the absence of a rate set by the agreement between the parties").
 
 
 61
 We think that the district court here correctly concluded that an Illinois court would decide the prejudgment interest issue under the same law as that used to interpret the contract. This result is supported by Morris v. Wibaux, 159 Ill. 627, 43 N.E. 837 (1895) and by SCA Services, 599 F.2d 178. Morris involved a dispute over the performance of a contract for the sale of cattle; the contract was entered into and was to be performed in Montana. One of the issues in the case was whether Montana or Illinois law should govern the award of prejudgment interest. The Illinois Supreme Court held:
 
 
 62
 Where the rate of interest sought to be recovered is greater than that provided by statute where the remedy is sought to be enforced, and the law of the place of payment is pleaded and proved allowing a greater interest than that where the remedy is sought, then the lex loci may be invoked to show the contract is legal, and the true interpretation of the parties framing it.
 
 
 63
 Morris, 159 Ill. at 651, 43 N.E. at 844 (citation omitted). The court awarded prejudgment interest in accordance with the law of Montana. SCA Services similarly supports application of the Michigan prejudgment interest statute here. SCA Services was a diversity case in which this court applied the conflict rules of Illinois. We interpreted the following choice of law clause contained in a contract between two of the parties in the case:
 
 
 64
 All questions with respect to the construction of this Agreement and the rights and liabilities of the parties hereunder shall be determined in accordance with the provisions of the laws of the State of Michigan.
 
 
 65
 599 F.2d at 180. We found that the term "liabilities" includes the measure of recovery in the event of a breach and that "[i]nterest is a part of the measure of recovery," citing Restatement (Second) of Conflict of Laws Sec. 207 & comment e (1971). Comment e provides that the law of the state selected to determine the measure of recovery for breach of contract also "determines whether plaintiff can recover interest, and, if so, the rate, upon damages awarded him for the period between the breach of contract and the rendition of judgment." American Home correctly points out that SCA Services is distinguishable in that it dealt with the application of a choice of law clause contained in a contract. We believe, however, that our characterization of prejudgment interest as being subsumed under contract damages should extend as well to cases where the choice of law is governed by the Illinois conflict of law rules, rather than by contract.[14]
 
 
 66
 The district court held that under Michigan law the appropriate rate of prejudgment interest in this case is 12%. The court relied on two Michigan statutes which both provide for a 12% rate of interest: (1) section 600.6013 prescribes the rate of prejudgment interest "allowed on a money judgment recovered in a civil action ... from the date of filing the complaint to the date of satisfaction of the judgment", Mich.Comp.Laws Ann. Sec. 600.6013 (West Supp.1986); and (2) section 500.2006 provides that interest must be paid on insurance proceeds not paid on a timely basis to an "insured, an individual or entity directly entitled to benefits under [an] insured's contract of insurance ...", Mich.Comp.Laws Ann. Sec. 500.2006 (West 1983). American Home contends that neither statute is applicable to this case. It argues that section 600.6013 and section 500.2006 cannot be applied here because Northbrook's voluntary payment of a portion of the settlement reflected Northbrook's opinion that it would ultimately be found obligated to provide coverage to Dykema and that "[n]o Michigan decision interpreting those statutes has ever allowed the recovery of pre-judgment interest to an insurance carrier that has willingly contributed to a settlement pool on behalf of its assured." Appellant's Brief at 27. American Home also argues that section 500.2006 has no application to that portion of the damage award which represents Northbrook's contribution to the settlement pool; American Home asserts that this "statute was intended to apply only to the claim of an insured for an insurer's failure to pay a claim on a timely basis." Id. at 28.
 
 
 67
 We find that American Home is clearly required by section 600.6013 to pay prejudgment interest. American Home's arguments to the contrary are without merit. We need not reach the question whether American Home is also obligated to pay prejudgment interest under section 500.2006. Although section 600.6013 provides for interest from the date the complaint was filed and section 500.2006 permits the award of interest beginning 60 days after satisfactory proof of loss was received by the insurer, Dykema and Northbrook have sought interest only from the date of their counterclaim. Supplemental Opinion, 625 F.Supp. at 1075-76 n. 7. Thus, we need not reach the appellees' contention that they are also entitled to interest under section 500.2006.
 
 
 68
 We now come to the last issue involving prejudgment interest. American Home challenges the requirement that it pay interest on that portion of the damage award representing Karon's fees. The Karon law firm was hired by American Home to represent Dykema in the Barker litigation, and Karon initially billed only American Home for its services. When American Home stopped paying Karon's fees in December 1981, Karon began billing Dykema, and Dykema subsequently paid one-half of the fees which accrued after that date. The district court ordered American Home to pay Dykema $52,193.83 plus $18,843.23 in interest as reimbursement for Dykema's payment of fees to Karon. The court also ordered American Home to pay $51,231.13 jointly to Dykema and Karon plus $18,495.67 in interest for the unpaid portion of Karon's fees. American Home challenges the award of prejudgment interest with respect to the unpaid portion of the fees. The insurance company contends that Dykema has not established that Dykema is required to pay Karon with interest and that the court's award of interest directly to Karon is inappropriate as that firm is not a party to the lawsuit. Appellant's Brief at 28-29. We agree with American Home on these two points. We therefore reverse the district court's order insofar as it awards fees and interest to Karon, a non-party. On remand, the district court should only award interest on Karon's unpaid fees if Dykema can establish that it is required to pay such interest to Karon.
 
 V.
 
 69
 Finally, American Home challenges the district court's order requiring it to reimburse Dykema for a portion of the fees charged by Arnstein. The district court found that Dykema had retained Arnstein to aid in the settlement of the Barker suit as well as to represent Dykema in this declaratory judgment action. The court found that, under Michigan law, Dykema was not entitled to reimbursement for the fees it incurred in litigating this suit. District Court Opinion, 625 F.Supp. at 1069. However, it held that American Home was obligated to pay for the fees charged by Arnstein in connection with the Barker litigation. The court found that Dykema was forced to retain Arnstein to bring the Barker litigation to a close because American Home refused to communicate with Karon, the firm that American Home had originally hired to represent Dykema. Supplemental Opinion, 625 F.Supp. at 1070-71. American Home argues on appeal that the district court erred in concluding that Arnstein had been retained to represent Dykema in the Barker litigation. The only evidence to which American Home points in support of its position are three letters written by Brian Sullivan of Dykema to Thomas W. Conklin of Conklin & Adler; Conklin & Adler was hired by American Home to represent its interests in the Barker litigation. In these letters, Sullivan expressed satisfaction with Karon's work in the Barker lawsuit, and he also advised Conklin that Dykema had retained Arnstein to represent it in the present suit. These letters were apparently brought to the attention of the district court since that court found that "[e]ven if Dykema was satisfied with Karon's services, the circumstances between all of the parties warranted retaining Arnstein to negotiate the settlement of the Barker lawsuit." Supplemental Opinion, 625 F.Supp. at 1070. The district court also relied on affidavits submitted by attorneys associated with Dykema and Arnstein which supported its conclusion that a portion of Arnstein's fees was incurred in connection with bringing the Barker litigation to a close. The district court's finding is not clearly erroneous.
 
 VI.
 
 70
 We reverse the judgment with respect to damages and remand for reassessment of damages, attorneys' fees and prejudgment interest in accordance with this opinion. We affirm the district court's holding that Michigan law governs the rate of prejudgment interest. The court should award prejudgment interest on Karon's fees only if Dykema can establish on remand that it must pay Karon with interest, and the amount of these fees should be awarded to Dykema alone. We also affirm the district court's holding that Dykema must be reimbursed for the fees charged by Arnstein in connection with the Barker litigation.
 
 
 71
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 The complaint alleged that Rose played an active role in advising the Convention as to its potential liability stemming from the activities of its subsidiary and its subsidiary's use of the Convention's name in promoting the securities. Further, Rose was alleged to have actually become involved in the management of the Foundation during the summer of 1977: "Among Mr. Rose's functions at this time were to assist in choosing a new Board of Directors for the Foundation, to investigate the financial and legal situation of the Foundation, and to render advice relating to the Foundation's condition and activities." Third Amended Complaint p 71, Appellees' Supplemental Appendix at 101
 
 
 [2]
 The record does not indicate what action, if any, Northbrook took in response to the notification
 
 
 [3]
 Conklin also represents American Home before this court
 
 
 [4]
 The court also denied Dykema's and Northbrook's motion insofar as they sought attorneys' fees incurred in the course of the instant declaratory judgment action. This ruling has not been appealed
 
 
 [5]
 The district court ruled that the contracts in this case should be construed according to the laws of Michigan. Neither side appeals this ruling
 
 
 [6]
 The appellant and appellees use the terms "waiver" and "estoppel" interchangeably. There is, however, a significant difference between the two concepts. Under the doctrine of waiver, the insurer, by its words or conduct, has induced the insured to believe that coverage would not be affected by a variation from the strict requirements of the policy. 18 G. Couch, Cyclopedia of Insurance Law Sec. 71.2, at 216-17 (2d rev. ed. 1983). Estoppel, on the other hand, refers to "prejudicial reliance of the insured upon some act, conduct, or nonaction of the insurer." 16B J. Appleman, Insurance Law and Practice Sec. 9081, at 491-92 (rev. vol. 1981) (footnote omitted). The issue in this case is properly framed in terms of estoppel. "Where the loss is not covered by the policy it is inaccurate to speak of waiver, since there is nothing to waive." City of Carter Lake v. Aetna Casualty and Surety Co., 604 F.2d 1052, 1059 n. 5 (8th Cir.1979). Since American Home claims that the liability was never covered under its policy, Dykema and Northbrook cannot claim that American Home waived a defense otherwise provided under the terms of its policy
 
 
 [7]
 For this reason, we reject the proration theories advanced by American Home which are premised on there being two primary insurers at any given time. Appellant's Brief at 22-24. The Northbrook policy provides insurance only for the acts or omissions to which the American Home policy does not apply at all. When the American Home policy applies, the Northbrook insurance is by its terms excess
 
 
 [8]
 The American Home policy contains the following provision, to which appellees direct our attention:
 
 
 [2]
 Limits of Liability
 The limit of liability stated in the declarations as applicable to "each claim" is the total limit of the company's liability for all damages arising out of all acts or omissions in connection with the same professional service regardless of the number of claims or claimants.
 American Home Policy p 2 (Conditions), Appellees' Supplemental Appendix at 17. This paragraph is not germane to the question before us for the same reason that an inquiry into "cause" and "single/multiple occurrences" is not.
 
 
 [9]
 For this reason, we think the district court erred in relying on cases such as Pioneer National Title Insurance Co. v. Andrews, 652 F.2d 439 (5th Cir.1981); Aetna Casualty, 575 F.Supp. 901; and Business Interiors, Inc. v. Aetna Casualty and Surety Co., 751 F.2d 361 (10th Cir.1984)
 
 
 [10]
 In their petition for rehearing and suggestion for rehearing in banc, Dykema and Northbrook for the first time cite supporting authority for their position that only the act or omission (and not the injury) need occur during the policy period to trigger coverage under an "acts, errors, or omissions" policy:
 The occurrence form offers the advantage of coverage beyond the date of the policy's expiration, regardless of when the injury occurred or when the claimant's cause of action accrued, but only if an act or omission occurred during the policy period. ... A principal benefit of the occurrence policy is that it affords the attorney coverage until he is protected by the statute of limitations.
 Mallen & Levit, Legal Malpractice Sec. 709, at 888 (1981) (footnote omitted). This treatise, however, does not provide unambiguous support for the position advocated by Dykema and Northbrook because it also states that when the error for which the insured is seeking coverage is an omission
 there may be one of several dates upon which coverage can be based: (1) the date that the continued inaction became negligence or (2) the date the injury occurred.
 Id. at 889 (emphasis added).
 Even if we found that the Michigan Supreme Court would not require that the injury, as well as the act or omission, occur within the policy period, we would still conclude that American Home is liable only for the damages arising from those sales which occurred during the term of its policy. We believe that the cause of the Barker plaintiffs' injuries was Dykema's failure to disclose information concerning the Foundation's financial condition and that a separate omission occurred each time a bond or note was sold; thus, we see no reason to adopt the district court's suggestion that there was but a single continuing omission. And, consequently, even if coverage under an acts or omissions policy is triggered by the omission and not by the injury, liability would still be prorated between the two insurers in this case.
 
 
 [11]
 For this same reason, we reject American Home's argument from contract law that the Foundation did not breach its agreements with the investors until it failed to return to them "their initial capital plus the specified interest at the scheduled maturity date." Appellant's Brief at 9-10 (citations omitted)
 
 
 [12]
 We are not persuaded by appellees' position that Dykema's failure to disclose was but a single continuing omission which began during the period of American Home's policy and their contention "that when a continuing act or omission in connection with the same professional service extends over more than one policy period, the first policy provides full coverage, up to policy limits." Appellees' Brief at 24. To support this proposition, Dykema and Northbrook rely on cases involving the issue whether there has been a single or multiple occurrence for the purpose of applying policy limits. As noted, these cases are not directly relevant to the present issue. See supra pp. 1083-84 & n. 9
 
 
 [13]
 Neither party has appealed the district court's ruling that Michigan law governs the substantive insurance coverage issues in this case. See supra p. 1081 n. 5
 
 
 [14]
 Because we have concluded that under Illinois conflicts law the issue of prejudgment interest is resolved by the same law as that used to interpret the contract itself, it is not necessary for us to consider the cases cited by American Home which hold that the law of the forum determines the availability of postjudgment interest. See Schoenfeld v. Neher, 453 F.2d 896 (10th Cir.1972); and Coleman v. Quaker State Coca-Cola Bottling Co., 331 F.Supp. 785 (E.D.Pa.1971). We note in passing that while the court in Schoenfeld applied the law of the forum with respect to postjudgment interest, the issue of prejudgment interest was determined by the law of California, which was also the law applied by the court to interpret the contract at issue. 453 F.2d at 899