# United States Court of Appeals
## For the First Circuit

No. 01-1219

THE RHODE ISLAND CHARITIES TRUST,

Plaintiff, Appellee,

v.

ENGELHARD CORPORATION,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge]

Before

Boudin, Chief Judge,

Gibson,* Senior Circuit Judge,

and Torruella, Circuit Judge.

H. Jerome Strickland with whom Robert C. Norman, Jones, Cork & Miller, Benjamin V. White and Vetter & White were on brief for appellant.
Michael P. DeFanti with whom Brian C. Newberry and Hinckley, Allen & Snyder LLP were on brief for appellee.

---

*Honorable John R. Gibson, of the Eighth Circuit, sitting by designation.

BOUDIN, Chief Judge. Engelhard Corporation appeals from the district court's grant of summary judgment, and its award of $597,463 in damages plus $191,029.60 in prejudgment interest, in favor of the Rhode Island Charities Trust ("the Trust"). The facts are somewhat complicated but undisputed.

In 1937, the Trust was formed for the purpose of distributing money grants for charitable purposes. In 1948, the Trust purchased Southern Clays, Inc., a kaolin mining and processing company based in Georgia. Kaolin is a clay which, among other uses, is widely employed in the paper industry. In 1963, the Trust sold nearly all of the assets of Southern Clays, with the exception of certain clay properties in Washington County, Georgia, to the Freeport Sulphur Company ("Freeport").

At the same time, Southern Clays and Freeport entered into a ninety-nine year agreement (the "Indenture") as to properties containing the clay. Some of the properties are owned in fee by the Trust (the "fee properties"), while other properties are owned by third parties who have entered into mineral leases with the Trust with termination dates ranging from 1967 to 2023 (the "leased properties"). Under the

Indenture the Trust leased the fee properties to Freeport, and it assigned to Freeport its rights as to the leased properties. Engelhard acquired Freeport in 1985 and is its successor in interest; the Trust has succeeded to Southern Clays' rights under the Indenture.

The Indenture, whose pertinent provisions are reprinted in an appendix to this decision, requires a royalty payment to the Trust from Engelhard in consideration of the latter's right to mine the clay from the covered properties. To oversimplify slightly, the royalty rate for each period was 1.5 percent of Engelhard's "net receipts" from kaolin derived from the properties and sold by Engelhard during the period. Indenture ¶ 5(a). Engelhard was also required to pay real estate taxes on the fee properties and to make various payments on the leased properties, including the royalties that the Trust was required to pay to the third-party owners. Id. ¶ 7(a), (c). Engelhard was entitled to deduct these payments from the royalties it paid to the Trust. Id. ¶ 7(b).

One other set of provisions in the Indenture is important to the dispute that is now before us. With respect to the leased properties, Engelhard was entitled under the Indenture to alter, modify, renew, or extend those third-party leases (by agreement with the relevant third-party owners).

Indenture ¶ 2(e).  This could be done either before or upon expiration and without the Trust's consent.  Id.  But, as to any changes effective before the preexisting termination date of a lease that was renewed or extended, any increase in fixed costs or in the royalties payable to the owners under the new terms was to be borne by Engelhard.  Id.

This case centers around a group of leased properties that are described in paragraph 23 of the Indenture (the "Veal leases").  The Veal leases all had a royalty rate negotiated years ago that is very low by current prices ($.11 per cubic yard) and had termination dates of March 23, 1995.  Because of royalty disputes with the third-party owners, Engelhard did not mine the properties until the 1990s.  In August 1990, Engelhard agreed with the owners to extend the terms for 20 years and increase royalties immediately--by a multiple of almost 30--to $3 per cubic yard on three leases and $2.90 on the fourth. For the remainder of the preexisting lease terms, Engelhard absorbed the cost of the increased royalties.

Then, in mid-1995, Engelhard began deducting the increased royalties on the Veal lease extensions from the total royalties due to the Trust from all covered properties--not just the Veal leases--with drastic effects on the payments otherwise due to the Trust.  Although Engelhard's semi-annual payments to

the Trust usually exceeded $300,000, the payment for the last six months of 1995 was $30,000. By its calculations, the Trust was effectively paying Engelhard, by a reduction in royalty payments, about $1.80 for each cubic yard Engelhard mined on Veal properties.

In due course, the Trust brought suit against Engelhard in federal district court in Rhode Island. The complaint alleged that Engelhard had violated the terms of the Indenture, violated the implied covenant of good faith and fair dealing, and violated an alleged fiduciary duty owed by Engelhard to the Trust. On cross motions for summary judgment, the district court held for the Trust on the implied covenant claim and for Engelhard on the contract and fiduciary duty counts. In substance, the court held that Engelhard could not deduct the increased royalty payments on the Veal leases from other royalties due to the Trust.

Engelhard now appeals to this court. It says that the district court erred so far as it favored the Trust and, further, in awarding prejudgment interest to the Trust as to royalties wrongly withheld by Engelhard since 1995. The parties are agreed that Georgia law governs the contract-related issues; they disagree about whose law controls as to prejudgment interest. On the grant of summary judgment and the legal issues

presented as to prejudgment interest, our review is de novo. Augat v. Fenoglio, 254 F.3d 368, 370 (1st Cir. 2001).

In our view the able district judge reached the correct result and our own analysis differs only in emphasis. Specifically, we think that the contract, read in the framework of plausible business expectations, can reasonably be read only one way, namely, to preclude the negative royalty deductions sought by Engelhard and, for that reason, the district court's judgment is correct without regard to the Trust's implied covenant claim. But the difference is more a matter of labels than of substance.

The critical language of the Indenture provides in paragraph 5 for the 1.5 percent royalty to the Trust. In subparagraph 7(a) the Indenture sets forth Engelhard's obligation to pay both (i) taxes on fee properties and (ii) payments on leased properties that the original lessee must pay "other than royalties on production, provision for which is made in [subparagraph 7(c)]." Subparagraph 7(b) then allows "[t]he aggregate amount" of all such payments under subparagraph 7(a)-- taxes and non-royalty payments--to be deducted by Engelhard from "the aggregate royalties" payable to the Trust.

Subparagraph 7(c) then treats in a single provision the subject of production royalties payable to the owners of leased land _and_ credits for payment of those royalties:

> [Engelhard] also agrees to pay to the person entitled thereto all royalties based on production required to be paid under the Leases, but with respect to any Lease only so long as [Engelhard] remains an assignee thereof; provided, however, that [Engelhard] shall be entitled to a credit for any amounts paid or payable by it pursuant to this subparagraph (c) against royalties thereafter payable to [The Trust] under the provisions of Paragraph 5 of this Agreement.

It is this "entitled to a credit" language on which Engelhard relies in deducting the full amount of the Veal lease royalties paid to the landowners from the total royalty package owed by Engelhard to the Trust under the Indenture. The Trust, it should be stressed, does not claim to be owed any royalties after mid-1995 from sales by Engelhard of kaolin derived from the Veal properties. It simply wants to prevent its non-Veal related royalties from being reduced because of the increased royalties that Engelhard has agreed to pay the Veal property owners.

Although Engelhard thinks that the language of subparagraph 7(c) is unequivocally in its favor, this is far from true. Indeed, if words alone are considered, the Trust can point--as the district court noted--to the contrast with

-7-

subparagraph 7(b) which (unlike subparagraph 7(c)) provides for the deduction of the specified items from <u>aggregate</u> royalties owed to the Trust.  But it is guesswork whether the omission of the term "aggregate" in subparagraph 7(c) was intended to control the issue before us; quite likely the drafters never envisaged the precise problem.  Certainly, there is no extrinsic evidence that they did.[1]

But even if the language taken in the abstract is not decisive in the Trust's favor and even if the drafters never focused on the risk of negative royalties, only one reading of the contract makes any sense.  No rational party in the Trust's position would agree to such negative royalties, nor would anyone in Engelhard's position demand such an option, because it would create an extraordinary perverse incentive for Engelhard to engage in otherwise irrational conduct and would create an unlimited risk to the Trust's legitimate general expectations. The point is so obvious as to require only brief explanation.

_____

[1]In an attempt to show that the parties considered the present scenario, Engelhard points to subparagraph 2(e), which provides that Engelhard shall not modify any existing lease unless it agrees to pay any additional fixed costs or royalties itself for the period <u>prior</u> to the lease's natural termination date.  This provision does nothing to suggest that the parties thought about increased royalties being deducted from the <u>aggregate</u> royalties owed to the Trust <u>after</u> the natural termination date.

If the contract were read as the Trust urges, it might well make economic sense for Engelhard to agree to a lease extension for the Veal property coupled with a very large increase in royalties paid to the owners. That would depend on whether the increase in kaolin prices was large enough for Engelhard to pay a greatly increased royalty to the Veals and still have room for a reasonable profit after mining and processing costs were paid. In fact, although unnecessary to our reasoning, it appears that Engelhard (reasonably enough) paid $3 or less in royalties to the Veal property owners while the kaolin could be sold for $4 or more.

But if the contract were read as Engelhard urges, then it would have an incentive to pay royalties on extended leases in any amount necessary to secure the extension up the point that all of the Trust's other royalties were wiped out. Of course, Engelhard might always prefer to pay the third party owners as little as possible. Nevertheless, its reading would make it profitable (for Engelhard) to make lease extensions that were economically unsound as a whole (e.g., on high extraction-cost property) simply because it could offload the royalty costs onto the Trust, which received no benefit from the lease extension.

-9-

There is a long tradition in contract law of reading contracts sensibly; contracts--certainly business contracts of the kind involved here--are not parlor games but the means of getting the world's work done. Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302 (1st Cir. 2001). Even where courts are sure that the parties never thought about an issue, small wrinkles may be ironed out by interpretation where it is clear how the parties would have handled them. Farnsworth, Contracts § 7.16, at 545 (1990). Although no Georgia case directly in point has been cited to us, we are confident that Georgia courts are as commonsensical as those elsewhere in the country. See Ga. R.R. Bank & Trust v. Fed. Deposit Ins. Corp., 758 F.2d 1548, 1551 (11th Cir. 1985).

True, parties can contract for preposterous terms. If contract language is crystal clear or there is independent extrinsic evidence that something silly was actually intended, a party may be held to its bargain, absent some specialized defense. But the language here is not at all clearly in Engelhard's favor; nor is there any extrinsic evidence as to original intent. Some evidence exists of what Engelhard unilaterally thought when it began to negotiate the extensions, and it is seemingly unhelpful to Engelhard's current position;

but the post-Indenture views of one side are in any event poor evidence of what the parties originally negotiated.

In our view there was nothing unreasonable about Engelhard's extension of the Veal leases: the transaction looks as if it made sense, and Engelhard thought it made sense, even if it could not deduct the higher third party royalties against non-Veal lease royalties owed to the Trust. And this is so even though the extensions might wipe out all Veal lease royalties to the Trust after mid-1995; the Trust, after all, had no assurance that the Veal leases could ever be extended on terms that would give the Trust anything after mid-1995.

The problem for us is not that the leases were extended on the terms agreed between Engelhard and the owners but that Engelhard wants to deduct the new royalties due to the Veal owners not just from the royalties due to the Trust on the Veal leases but also from the Trust's other royalties. Possibly the covenant of good faith and fair dealing, compare West v. Koufman, 384 S.E.2d 664, 666 (Ga. 1989), with Automatic Sprinkler Corp. of Am. v. Anderson, 257 S.E.2d 283, 284 (Ga. 1979), could be used in this context--not to "limit discretion" but as a gap-filler for a situation not anticipated by the parties. See Thomas Diamond & Howard Foss, Proposed Standards for Evaluating When the Covenant of Good Faith and Fair Dealing

<u>Has Been Violated: A Framework for Resolving The Mystery</u>, 47 Hastings L.J. 585, 586-87 (1996). But to us it is more straightforward simply to say that subparagraph 7(c) does not permit the deduction of royalties on an aggregate basis but only on a lease-by-lease basis.

Separately, Engelhard asks us to reverse the district court's award to the Trust of prejudgment interest on the unpaid royalties. Applying Rhode Island law, the district judge directed that the statutory rate of 12 percent interest apply from date of accrual to date of judgment. R.I. Gen. Laws § 9-21-10 (1997). Engelhard says that Georgia law governs prejudgment interest and under Georgia law no prejudgment interest, or at least a lesser amount, would be awarded. O.C.G.A. § 7-4-2 (Michie 1997); <u>id.</u> § 13-6-13 (Michie 1982).

Under settled conflict principles, the question whether Rhode Island or Georgia rules on prejudgment interest should be applied by a district court sitting in diversity in Rhode Island depends on how a Rhode Island state court would resolve the matter. <u>Klaxon</u> v. <u>Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941); <u>Commercial Union Ins. Co.</u> v. <u>Walbrook Ins. Co. Ltd.</u>, 41 F.3d 764, 774 (1st Cir. 1994). Here, there is every reason, short of an unqualified decision by the Rhode Island Supreme Court, to believe that--as the district court held in a bench

-12-

ruling--Rhode Island courts measure the award as a matter of Rhode Island law even where the dispute is controlled by the substantive law of another state.

The Rhode Island prejudgment statute, typically enough, does not contain any choice of law directions. We are forbidden under Supreme Court precedent, see Salve Regina Coll. v. Russell, 499 U.S. 225, 238-39 (1991), from giving any separate weight to the fact that the district judge is expert in Rhode Island law, having sat for many years on the state court and then on the federal court in Rhode Island. So we merely record his factual report that in over 30 years on the bench, he never heard of a case of a Rhode Island court applying the prejudgment interest law of a different state.

In all events, some states, like Massachusetts, treat prejudgment interest as substantive, Morris v. Watsco, Inc., 433 N.E.2d 886, 889 (Mass. 1982); Commercial Union, 41 F.3d at 774, while "others associate prejudgment interest with costs and attorneys' fees which are governed by the law of the forum," Am. Home Assurance Co. v. Dykema, Gossett, Spencer, Goodnow & Trigg, 811 F.2d 1077, 1088 (7th Cir. 1987). What little precedent exists on this issue in Rhode Island suggests that for conflict of law purposes, Rhode Island courts view their own prejudgment interest statute as "procedural" (and so governed by local law)

rather than "substantive." <u>Holmes</u> v. <u>Bateson</u>, 434 F. Supp. 1365, 1391 (D.R.I. 1977).

To the extent that prejudgment interest is viewed simply as an element of damages, standard conflict analysis would associate it with the substantive law governing the controversy, here, Georgia law. But Rhode Island prejudgment interest, although partly intended to compensate the plaintiff for temporary loss of the use of his money, is also administrative, being intended to promote the prompt settlement of claims. <u>Roy</u> v. <u>Star Chopper Co., Inc.</u>, 584 F.2d 1124, 1135 (1st Cir. 1978); <u>Isserlis</u> v. <u>Dir. of Pub. Works</u>, 300 A.2d 273, 274 (R.I. 1973). Given the latter objective, there is patently a local interest in applying Rhode Island's prejudgment rule even to "foreign" causes of action.

<u>Affirmed</u>.

2. <u>Lease and Assignment; Rights of Lessee.</u>

     (e) It is expressly understood that the Lessee [Engelhard] shall, without obtaining the consent of the Lessor [the Trust] (or any Transferee or the Bank provided in Paragraph 8 hereof), be entitled to enter into any agreement to alter, modify (aside from complete termination), renew or extend any and all Leases and enter into new or additional leases or agreements with respect to any Leased Properties covered thereby, to such extent as [Engelhard] may deem desirable, provided, however, that [Engelhard] shall not make any alteration or modification of any Lease or other arrangement in connection with such Lease (other than alterations, modifications or arrangements contemplated by the terms of the Leases now in effect or which would result by reason of the provisions of any Lease now in effect from the exercise of any option contained therein) which with respect to the period prior to the normal termination date of such Lease would increase any fixed costs to be paid by the lessee thereunder [the Trust] or would increase the amount of royalties payable by [the Trust] with respect to any minerals, ores or substances permitted to be mined by such lessee on the date thereof, unless [Engelhard] agrees to pay such increased fixed costs or additional royalties.

5. <u>Royalties</u>

     (a) [Engelhard] agrees to pay to [the Trust] for each Royalty Period on (i) processed clay and other processed minerals and unprocessed minerals other than clay, (ii) unprocessed clay and (iii) "mixed products" (as hereinafter defined), sold in

such Royalty Period, the sum of the royalties determined as hereinafter provided in clauses (i), (ii) and (iii), respectively, of this subparagraph (a):

(i) A royalty equal to one and one-half percent (1.5%) of [Engelhard's] Net Receipts from sales in such Royalty Period of each kind of processed clay and other processed mineral. . . and each kind of unprocessed mineral, other than clay, derived from the Properties. . . .

(ii) A royalty equal to one and one-half percent (1.5%) of the Net Receipts that would have been received by [Engelhard] in such Royalty Period if a number of tons of processed clay which could have been produced from the number of tons derived from the Properties of each kind of unprocessed clay sold in such Royalty Period had been sold in such Royalty Period. . . .

(iii) A royalty equal to one and one-half percent (1.5%) of an amount obtained by multiplying (x) the number of tons derived from the Properties of each kind of "mixed product", as hereinafter defined . . . sold by the Engelhard in such Royalty Period by (y) the Average Net Receipts per ton from sales in such Royalty Period (or if there were no such sales, in the next preceding Royalty Period in which there were such sales) of processed clay or other processed mineral derived from the Properties of the same or most nearly similar kind as that contained in such "mixed product". . . .

7.    Taxes And Other Charges.

(a) [Engelhard] covenants and agrees to pay (i) all real estate taxes imposed on or assessed against the Fee Properties, provided that [Engelhard] shall have the right to contest the amount or validity of any tax by appropriate proceedings and [Engelhard] shall not be required to pay any tax so contested by it until final determination thereof and provided further that real estate taxes on any Fee Property shall be apportioned as of the date such Fee Property ceases to be a Fee Property hereunder; and (ii) except as provided in subparagraph (d) of this Paragraph 7, all payments (other than royalties based on production, provision for which is made in subparagraph (c) of this Paragraph 7) which [the Trust] is required to make under the Leases (so long as they are in effect); provided, however, that nothing contained herein shall require [Engelhard] to pay any tax imposed upon or measured by the income or receipts of [the Trust] or any other person or any transfer tax, capital gain tax, gift tax, succession duty or inheritance tax of [the Trust] or any other person.

(b) The aggregate amount of all payments made or payable by [Engelhard] for all Royalty Periods within any calendar year pursuant to subparagraph (a) of this Paragraph 7 shall be  deducted from the aggregate royalties payable by [Engelhard] for such Royalty Periods pursuant to Paragraph 5 hereof.

(c) [Engelhard] also agrees to pay to the person entitled thereto all royalties based on production required to be paid under the Leases, but with respect to any Lease only so long as [Engelhard] remains an assignee thereof; provided, however, that [Engelhard] shall be entitled to a credit for any

-17-

amounts paid or payable by it pursuant to this subparagraph (c) against royalties thereafter payable to [the Trust] under the provisions of Paragraph 5 of this Agreement. . . .