COMMERCIAL UNION INSURANCE
CO., Plaintiff, Appellant,

v.

WALBROOK INSURANCE CO., LTD.,
et al., Defendants, Appellees.

No. 92–2415.

United States Court of Appeals,
First Circuit.

Heard Aug. 5, 1993.

Decided Sept. 28, 1993.

Rehearing and Suggestion for Rehearing
En Banc Denied Nov. 22, 1993.

Stephen A. Cozen, with whom Cozen and O'Connor, Lawrence T. Bowman, Richard C. Bennett, Philadelphia, PA, Parker, Coulter, Daley & White, Richard L. Neumeier, Quinn and Morris and Robert H. Quinn, Boston, MA, were on brief for plaintiff, appellant.

Robert J. Brown with whom Mendes & Mount, John J. Curley, Mark A. DiTaranto, New York City, Badger, Dolan, Parker & Cohen, James B. Dolan and Erin R. Boisvert, Boston, MA, were on brief for defendants, appellees.

Before CYR and STAHL, Circuit Judges, and FUSTÉ,* District Judge.

CYR, Circuit Judge.

In 1982, Commercial Union Insurance Company ["CU"] brought the present lawsuit seeking a judicial declaration that an umbrella insurance policy issued by Walbrook Insurance, et al. [collectively, "Weavers"] covered CU's liability for damages to third parties as a result of an industrial explosion.[1] Following extended discovery proceedings, both CU and Weavers moved for summary judgment. The district court entered summary judgment for Weavers, and CU appealed. We now reverse.

## I

### BACKGROUND

CU's loss prevention department provided safety inspections to industrial facilities on a "fee-for-services" basis. Between 1973 and 1975, a CU inspector conducted several inspections of the Peterson/Puritan aerosol-packing plant in Cumberland, Rhode Island. On January 17, 1976, a gas line exploded at the Peterson plant, killing or injuring several people [the "Peterson Incident"]. CU was named as a defendant in several tort suits stemming from the Peterson Incident. The present insurance-contract litigation is an outgrowth of CU's attempt to obtain coverage under its umbrella policy with Weavers for claims arising out of the Peterson Incident.

### A. The Insurance Policies

At the time of the Peterson Incident, CU carried a primary corporate liability policy underwritten by Travelers Insurance Company [the "Travelers Policy"], covering up to $1 million of CU's liability for occurrences during the Travelers Policy period—January 1 through July 1, 1976. However, the main body of the Travelers Policy specifically excluded occurrences involving malpractice by CU's engineers.

To fill part of this gap in coverage, Travelers issued a separate "Engineers Professional Liability ["EPL"] Endorsement." But though the main body of the Travelers Policy provided coverage on an occurrence-basis, the Travelers EPL Endorsement covered only claims filed during the policy period. Thus, even with the EPL Endorsement, the Travelers Policy left uncovered EPL occurrences for which no claim was filed within the policy period.

At the time of the Peterson Incident, CU also carried an umbrella policy issued by Weavers ["Weavers Umbrella"], which covered "all sums ... imposed upon [CU] by law ... or assumed under contract ... for damages on account of ... personal injuries, property damage, [or] advertising liability ... arising out of each occurrence happening anywhere in the world." Immediately following the quoted language is a section entitled "LIMIT OF LIABILITY," subsection (a) of which provides that if an occurrence is covered by another specified policy, the Weavers Umbrella would pay only the excess over the other policy's limits, up to the Weavers Umbrella policy limits. If an occurrence was not covered by another policy, the next subsection ((b)) provides that the Weavers Umbrella would cover the excess over a $25,000 "self-insured retention," i.e., a deductible, up to the Weavers Umbrella limits. The latter clause in turn was modified by a two-part EPL Endorsement ["Weavers EPL Endorsement"].

The first part of the Weavers EPL Endorsement, which we refer to as the "Weavers EPL Extension," provides that:

---

* Of the District of Puerto Rico, sitting by designation.

1. As the parties agree that Massachusetts law governs their contract dispute, we apply Massachusetts law. See Carey v. Bahama Cruise Lines, 864 F.2d 201, 206 (1st Cir.1988) (given "reasonable relation" between dispute and forum whose law is invoked by parties, court of appeals may "forego independent analysis" of choice-of-law issue); Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir.1991) (similar).

this policy is extended to include Engineers Professional Liability as more fully described in the underlying General Liability policy/ies [*i.e.*, the Travelers Policy] ... and that as respects such coverage this policy is subject to the same warranties, terms and conditions ... as are contained in the said underlying policy/ies....

The parties agree that the Weavers EPL Extension afforded coverage on a "claims-basis" only, since its terms explicitly incorporate the terms and conditions of the underlying Travelers Policy, itself claims-based.

On the same page with the Weavers EPL Extension appears language amending the "LIMIT OF LIABILITY" section of the Weavers Umbrella policy [the "Liability Amendment"]. The language of the Liability Amendment is substantially identical to the language in the main body of the Weavers Umbrella, except that it amends the ultimate net loss limit contained in subsection (b) of the Weavers Umbrella to provide coverage for: "the excess of ... $25,000 ultimate nett [sic] loss in respect of each occurrence not covered by said underlying [Travelers] insurances but in respect of engineering services liability $250,000 ultimate nett [sic] loss [for] each occurrence not covered by said underlying [Travelers] insurance."

## B. *The Peterson Claims*

Although it was later discovered that none of the lawsuits against CU arising out of the Peterson Incident [the "Peterson Claims"] were filed within the Travelers Policy period, Travelers initially undertook the defense of the Peterson Claims at CU's request. Weavers monitored Travelers' defense of the Peterson Claims during this period as well.

Later, in June 1982, CU informed Travelers that it had determined that no timely claim based on the Peterson Incident had been filed during the Travelers Policy period.

CU accordingly released Travelers from all obligations under the Travelers Policy, "in the interest of 'fair business dealings.'" Meanwhile, CU settled the Peterson Claims for approximately $2.5 million, obtaining primary indemnification in the amount of $1 million from American Employers Insurance Company ["American Employers"].[2]

Upon learning that CU had released Travelers, Weavers informed CU that the Weavers Umbrella did not cover the Peterson Claims. Consequently, in November 1982, CU brought the present action for a judicial declaration that the Weavers Umbrella covered the Peterson Claims, and therefore that Weavers must indemnify CU for the approximate $1.5 million cost of settling the Peterson Claims over and above the $1 million paid by American Employers.[3] After years of contentious discovery proceedings, CU and Weavers filed cross-motions for summary judgment. The district court thereafter granted summary judgment in favor of Weavers.

CU advances alternative arguments on appeal. First, it urges that the main body of the Weavers Umbrella must cover EPL on an *occurrence* basis because the Weavers EPL Endorsement, rather than diminishing the EPL coverage extended under the main body of the Weavers Umbrella, provides *additional* EPL coverage on a *claims*-basis. Alternatively, CU insists, the Peterson Claims pleaded in its complaint include non-EPL claims which are covered under the main body of the Weavers Umbrella.[4]

Weavers proposes a very different interpretation, one which results in no EPL coverage under the main body of the Weavers Umbrella. As Weavers sees it, the sole source of EPL coverage is the Weavers EPL Endorsement itself. But since the EPL coverage provided in the Weavers EPL Endorsement is concededly *claims*-based, CU's

---

2. The American Employers policy was a successor to the primary liability policy issued by Travelers, identical in all relevant respects except that the American Employers policy period extended from July 1, 1976 to July 1, 1979 (thus encompassing the Peterson Claims).

3. CU calculated this sum as follows: $2,502,874.30 [cost of defending against and settling

Peterson Claims] minus $1,000,000.00 [primary insurance paid by American Employers], leaving $1,502,874.30, plus interest. The reasonableness of these figures is not at issue.

4. Since CU prevails on its first claim, we do not address its alternative claim.

declaratory judgment action fails as a matter of law, because the Peterson Claims were not filed within the Weavers Umbrella policy period.

## II

### DISCUSSION

#### A. Summary Judgment Standard

■ We review a grant of summary judgment *de novo*, employing the same criteria incumbent upon the district court in the first instance. *Pedraza v. Shell Oil Co.*, 942 F.2d 48, 50 (1st Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 993, 117 L.Ed.2d 154 (1992). Summary judgment is appropriate where the record, viewed in the light most favorable to the nonmoving party, reveals no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). This contract dispute presents pure issues of law for the court.

#### B. Construction of the Weavers Umbrella Policy

■ The proper construction of an insurance contract is a matter of law for both trial and reviewing courts. *Cody v. Connecticut General Life Ins. Co.*, 387 Mass. 142, 439 N.E.2d 234, 237 (1982). Insurance contract terms are given their ordinary meaning, *Continental Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 374–75 (1st Cir.1991) (applying Mass. law), based on an examination of the entire policy, including its endorsements, *see Falmouth Nat'l Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058, 1061 (1st Cir. 1990) (applying Mass. law), with a view to effectuating the intentions of the parties, *Eagle–Picher Indus., Inc. v. Liberty Mut. Ins. Co.*, 682 F.2d 12, 17 (1st Cir.1982) (applying Ill. & Ohio law), *cert. denied,* 460 U.S. 1028, 103 S.Ct. 1279, 1280, 75 L.Ed.2d 500 (1983), but without "disregard[ing] the plain language of the policy in order to give effect to

what [the court considers to have been the probable] intentions of the parties," *Reliance Ins. Co. v. Aetna Cas. & Sur. Co.*, 393 Mass. 48, 468 N.E.2d 621, 624 (1984).

#### 1. EPL Coverage Under the Main Body of the Weavers Umbrella

■ The district court held that the Weavers Umbrella did not address EPL claims and that the Weavers EPL Endorsement did not cover the Peterson Claims. We conclude that the plain language in the main body of the Weavers Umbrella itself afforded CU occurrence-based EPL coverage.

Section I of the Weavers Umbrella (entitled "COVERAGE") states that:

[Weavers] hereby agree[s], subject to the limitations, terms and conditions hereinafter mentioned, to indemnify [CU] for all sums which [CU] shall be obligated to pay by reason of the liability

(a) imposed upon [CU] by law, or

(b) assumed under contract or agreement by [CU] and/or ... an employee of [CU], while acting in his capacity as such,

for damages on account of

(i) Personal Injuries

(ii) Property Damages

(iii) Advertising liability

caused by or arising out of each *occurrence* happening anywhere in the world [emphasis added].

An "occurrence" is defined as "an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period."

Section II (entitled "LIMIT OF LIABILITY") immediately follows the "COVERAGE" section, and limits Weavers' liability to the *excess* of either: (a) the limits of the elsewhere specified underlying insurance [Travelers] policy; or (b) $25,000 ultimate net loss for each *occurrence* not covered by the specified underlying [Travelers policy], in both cases up to the Weavers Umbrella limits.[5]

---

**5.** Importantly, language appearing on the same page as the Weavers EPL Endorsement amends this provision so as specifically to include a

$250,000 "deductible" when the Weavers Umbrella "drops down" to provide primary EPL coverage. *See infra* at 1053.

The "COVERAGE" and "LIMIT OF LIA-BILITY" sections must be construed compatibly, *Rice Growers Ass'n v. F. Carrera & HNO, Inc.*, 234 F.2d 843, 846 (1st Cir.1956) (applying general contract principles); *cf. Rosen v. A–H, Inc.*, 17 Mass.App.Ct. 126, 456 N.E.2d 477, 480 (1983), as the latter plainly delimits the former.[6] Thus, under subsection (a), when an occurrence is covered by underlying insurance, the Weavers Umbrella provides *excess* coverage for losses above the limits of the underlying primary policy. Under subsection (b), however, when an occurrence is not covered by underlying insurance, the Weavers Umbrella "drops down" and provides primary coverage.[7] For such umbrella coverage to extend, either on an excess basis (per (a)), or on a primary basis (per (b)), the occurrence must be covered under the Weavers Umbrella in the first place. As noted below, however, the Weavers Umbrella defines "occurrences" very broadly.

The main body of the Weavers Umbrella extends coverage for "all sums imposed for damages on account of personal injuries or property damage caused by occurrences." But because an umbrella policy does not provide blanket coverage, in its "LIMIT OF LIABILITY" section the Weavers Umbrella confines the scope of its coverage by means of specific limits and exclusions; *e.g.*, "but only in excess of the limits of underlying insurance" per (a). Thus, it is not surprising that the "COVERAGE" provisions in the main body of the Weaver Umbrella make no explicit mention of EPL coverage. Indeed, the broad language of the Weavers Umbrella "COVERAGE" provisions identifies *no particular activity* whatever, for the simple reason that coverage under the main body of the Weavers Umbrella is afforded for *all activi-*

ties *which result in occurrences for which CU must respond in damages.*

The parties agree that the Peterson Incident *occurred* within the Weavers Umbrella policy period. An explosion at an industrial plant plainly constitutes an "occurrence" within the meaning of the Weavers Umbrella, whose broad language provides that every activity which results in an occurrence for which CU must respond in damages is covered, unless specifically excepted. Nowhere in the main body of the Weavers Umbrella are EPL acts or omissions excepted from coverage, either explicitly or implicitly. Accordingly, we conclude that the main body of the Weavers Umbrella extended indemnification for damages which CU was obligated to pay due to EPL or any other (non-excepted) act or omission.

### 2. *The Weavers EPL Endorsement*

■ The Weavers EPL Endorsement must be construed compatibly with the Weavers Umbrella, of which it is a part. *See Falmouth*, 920 F.2d at 1061. The Weavers EPL Endorsement states that:

> as from inception this policy is *extended* to include [EPL] as more fully described in the underlying General liability policy/ies [referencing the Travelers Policy] ... and that as respects such [Travelers Policy] coverage this policy is subject to the same warranties, terms and conditions ... as are contained in the said [Travelers Policy] [emphasis added]....

Thus, whatever EPL coverage the Weavers EPL Endorsement extends, it undoubtedly extends on a *claims*-basis only, because the language of the Weavers EPL Endorsement follows the form of the Travelers EPL En-

---

**6.** Responding to a slightly different argument, the district court found that "the language of the endorsement upon which Commercial Union relies, which defines limits on liability, does not carry as much weight as the language upon which Weavers relies, which defines coverage." We believe that the structural interdependence of the two sections clearly indicates that full effect is to be given to the express terms in the "COVERAGE" section, but only to the extent consistent with the express terms in the companion "LIMIT OF LIABILITY" section. *Cf. Lydon v. Allstate Ins. Co.*, 5 Mass.App.Ct. 771, 359 N.E.2d

316, 317 (1977) (intent of parties "gathered from construing contract as a whole and not by placing special emphasis on any one part.").

**7.** Under this subsection (b) of the Weavers Umbrella, CU is covered only for amounts in excess of the $25,000 "deductible." Although Weavers refers to the coverage in subsection (b) as "excess" over a "self-insured retention" (as opposed to "primary" with a "deductible"), this difference in terminology is without functional significance.

dorsement, which is exclusively *claims*-based.

The crux of the present dispute concerns the meaning of the Weavers EPL Endorsement phrase: "this policy is extended to include [EPL] as more fully described in the underlying General liability policy/ies [referencing the Travelers Policy]. . . ." Since Weavers reads the language in the main body of the Weavers Umbrella as providing no EPL coverage at all, it regards the Weavers EPL Endorsement as the only conceivable source of EPL coverage. On this view, Weavers would not be obligated to indemnify CU for the Peterson Claims, because the only EPL coverage provided by the Weavers EPL Endorsement is *claims-based* and no claims were filed within the Weavers Umbrella policy period. Weavers insists that the language "this policy is *extended* to include [EPL]" supports its reading. Thus, Weavers urges the position that the Weavers EPL Endorsement "extends" a new *category* of coverage altogether; namely, EPL coverage. The district court found this reading "consistent with the intention of the parties because it would be unreasonable for [CU], a sophisticated policyholder, to purchase a special endorsement to provide coverage it already had." Although we agree that a sophisticated policyholder presumably would not purchase an endorsement for coverage it already had, our reading of the Weavers Umbrella, together with the Weavers EPL Endorsement, leads to no such unreasonable result.

CU argues that EPL coverage is indeed *extended* by the Weavers EPL Endorsement, but that this results in no redundancy in coverage whatever because the Weavers EPL Endorsement merely extends an additional sub-category of EPL coverage (*i.e.,* *claims*-based EPL coverage) to go with the *occurrence*-based EPL coverage already provided in the main body of the Weavers Umbrella. Thus, on CU's reading, the Weavers EPL Endorsement extends *claims*-based coverage "for those EPL claims arising out of accidents or occurrences that took place *prior to the Weavers Umbrella period* where claim was made during the [Weavers] policy period itself." Furthermore, CU reasons, the language of the Liability Amendment

(amending the "LIMIT OF LIABILITY" section so as to add a $250,000 "self-insured retention" for EPL) supports its claim that the main body of the Weavers Umbrella covers EPL. We think the plain language of the insurance contract as a whole, and the reasonable expectations of the parties, are effectuated under the interpretation urged by CU.

### 3. *The Weavers Umbrella Policy As a Whole*

In construing a contract, we must give reasonable effect to all terms whenever possible. *Jimenez v. Peninsular & Oriental Steam Navigation Co.,* 974 F.2d 221, 223 (1st Cir.1992) (collecting cases); *Feinberg v. Insurance Co. of N. Am.,* 260 F.2d 523, 527 (1st Cir.1958) (applying Mass. law). Our interpretation of the Weavers EPL Endorsement, as extending *claims*-based EPL coverage to complement the *occurrence*-based EPL coverage already afforded by the plain language in the main body of the Weavers Umbrella, gives full effect to all terms in the main body of the Weavers Umbrella and in the Weavers EPL Endorsement. Weavers' reading, on the other hand, by ignoring the plain meaning of the language in the main body of the Weavers Umbrella (which provides *occurrence*-based coverage, either primary or excess, regardless of the nature of the causative act or omission), renders the plain language in the Weavers EPL Endorsement meaningless as well.

■ The parties proffer extrinsic evidence relating to their own and each other's subjective understandings and intentions, as support for their particular interpretations. Under Massachusetts law, however, extrinsic evidence may not be used to contradict the unambiguous terms of a contract. *See ITT Corp. v. LTX Corp.,* 926 F.2d 1258, 1261 (1st Cir.1991). The ambiguity determination is subject to plenary review. *Fashion House, Inc. v. K Mart Corp.,* 892 F.2d 1076, 1083 (1st Cir.1989). Although the interdependence of the contract terms used in these policies and endorsements presents a formidable interpretive challenge, the contract language itself is anything but ambiguous. In

such circumstances, of course, we must give the contract terms their plain meaning. *Liberty Mutual Ins. Co. v. Gibbs,* 773 F.2d 15, 17 (1st Cir.1985) (applying Mass. law).[8]

Our integrated reading of the Weavers Umbrella policy as a whole is corroborated by the specific terms of the Liability Amendment, which contemplate "engineering services liability" *subject to a $250,000 deductible,* in circumstances where, as here, the Weavers Umbrella "drops down" to provide primary coverage of risks not covered by the underlying [Travelers] insurance policy. Thus, the Liability Amendment clearly replaces corresponding language in the "LIMIT OF LIABILITY" section of the main body of the Weavers Umbrella. We find untenable an interpretation which would provide a $250,000 EPL "deductible" for a risk not covered in the first place. *See supra* note 5 and accompanying text.

█ The interpretation proposed by CU better comports with the basic nature and purpose of "umbrella" policies. The first title line at the top of Weavers' printed policy form reads: *"UMBRELLA POLICY (LONDON 1971)."* Umbrella policies differ from standard excess insurance policies in that they are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage). *See Bryan Constr. Co. v. Employers' Surplus Lines Ins. Co.,* 60 N.J. 375, 290 A.2d 138, 139–40 (finding that insurance

policy was "expressly called an 'umbrella policy' by the insurer. Its very nomenclature suggested a purpose to protect against gaps in the underlying policies and indicated more than mere excess coverage") (1972); 8A John A. Appleman, *Insurance Law and Practice,* § 4909.85 at 452–53 (1981). Moreover, this interpretation is consonant with the broader function served by umbrella policies—extending coverage even to unanticipated "gaps." As one authority has explained, umbrella policies effectively shift *away from the insured* the burden of choosing the risks to which the insured remains exposed:

> [an umbrella] arrangement contrasts with the method of providing Excess Liability insurance along traditional lines. Under the excess approach, it is up to the insured ... to choose those exposures against which excess protection is desired. The obvious disadvantage lies in the possibility of a wrong guess about the critical exposures. Under the Umbrella Liability contract, the principal guesswork is in the [underwriter's] rating [of the overall risk]....

*F.C. & S. Bulletins,* "Companies and Coverages: Specialty Lines" at U–1 (December 1980) (*cited in* Pl.'s Br. at 33).

For the foregoing reasons, we hold that CU was entitled to summary judgment. The judgment previously entered in favor of appellee Weavers must be vacated, and judgment shall be entered for appellant CU.

---

**8.** Even were we to assume, *arguendo,* that the Weavers EPL Endorsement renders the Weavers Umbrella as a whole ambiguous, as a general rule ambiguities in insurance contracts are construed against the drafter (*"contra proferentum"*). *See* Robert E. Keeton, et al., *Insurance Law,* 628–30 (1988); *Falmouth,* 920 F.2d at 1061; especially so in determining exclusions from coverage, *see American Home Assur. Co. v. Libbey-Owens-Ford Co.,* 786 F.2d 22, 28 (1st Cir.1986) (applying "general insurance principles"). The district court felt that it ought not apply *contra proferentum* where the two parties to the insurance contract are "equally sophisticated," *citing Falmouth,* 920 F.2d at 1062 (applying "sophisticated parties" exception where insured negotiated for contract terms tailored to govern the outcome of a particular lawsuit). We have invoked the so-called "sophisticated parties" exception sparingly. *See, e.g., Continental Cas.,* 924 F.2d at 375 n. 4 (refusing to apply *Falmouth's* "sophisticated parties" exception in a case where the

"sophisticated party" did not "negotiat[e] specific terms tailored to govern the outcome of a particular lawsuit," *id.*); *Eagle–Picher,* 682 F.2d at 21 n. 6 (upholding exclusion of proof of bargaining power where evidence did not show, *inter alia,* that insured "actively participated" in drafting policy terms, *citing First Nat'l Bank of Decatur v. Insurance Co. of N. Am.,* 424 F.2d 312, 317 (7th Cir.1970) (Illinois law), *cert. denied,* 398 U.S. 939, 90 S.Ct. 1844, 26 L.Ed.2d 272 (1970)). *See also* E. Allan Farnsworth, *Contracts* (2nd Ed.) at 518 (1990) (noting that *contra proferentum* "may be invoked even if the parties bargained as equals" (*citing Bay State Smelting Co. v. Ferric Indus., Inc.,* 292 F.2d 96, 99 (1st Cir.1961)). Weavers proffers no evidence that CU participated in drafting the language at issue. In any event, of course, as the Weavers Umbrella policy language is not ambiguous, the *contra proferentum* presumption need bear none of the weight of our holding.

*Reversed and remanded for further proceedings consistent with this opinion.*