**COMMERCIAL UNION INSURANCE COMPANY, Plaintiff, Appellant,**

v.

**WALBROOK INSURANCE CO., LTD., et al., Defendants, Appellees.**

**COMMERCIAL UNION INSURANCE COMPANY, Plaintiff, Appellee,**

v.

**NATIONAL CASUALTY CO., et al., Defendants, Appellants.**

Nos. 94–1526, 94–1561.

United States Court of Appeals, First Circuit.

Heard Sept. 14, 1994.

Decided Dec. 5, 1994.

Richard L. Neumeier with whom Parker, Coulter, Daley & White, Boston, MA, was on brief, for Commercial Union Ins. Co.

James B. Dolan with whom Erin R. Boisvert, Badger, Dolan, Parker & Cohen, Boston, MA, Robert J. Brown, Mark A. DiTaranto, and Mendes & Mount, New York City, were on brief, for Walbrook Ins. Co., Ltd., et al.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

For the second time, we examine issues arising out of a dispute between Commercial Union Insurance Company ("CU") and Walbrook Insurance et al. (collectively, "Weavers") concerning Weavers's obligation to indemnify CU under an insurance contract. On initial appeal, we reversed the district court's grant of summary judgment in favor of Weavers and remanded the case for further proceedings consistent with our opinion. *Commercial Union Ins. Co. v. Walbrook Ins. Co.*, 7 F.3d 1047 (1st Cir.1993) ("*Commercial Union I*"). Both parties now challenge the district court's entry of judgment for CU and denial of cross-motions to amend or alter that judgment. Weavers has also moved to dismiss CU's appeal. We deny the motion to dismiss and affirm the entry of judgment below.

## I.

### FACTUAL BACKGROUND AND PRIOR PROCEEDINGS

Between 1973 and 1975, a CU loss-prevention inspector conducted several safety inspections of the Peterson/Puritan aerosol-packing plant in Cumberland, Rhode Island. On January 17, 1976, a gas line exploded at the plant, killing four people and injuring several others. Two years later, victims filed several suits naming CU as defendant ("Peterson claims"). CU eventually settled the Peterson claims. CU expended $2,502,874.30 for defense and in settlement of the claims. Ultimately, CU obtained primary indemnification in the amount of $1,000,000 from American Employers Insurance Company ("American Employers"), CU's primary corporate insurer for the period July 1, 1976 through July 1, 1979.[1]

At the time of the explosion, the Travelers Insurance Company had issued to CU a primary corporate liability policy ("Travelers Policy") effective from January 1, 1976, to July 1, 1976. The Travelers Policy provided occurrence-based coverage[2] during the policy period for up to $1 million of CU liability. The main body of the Travelers Policy specifically excluded occurrences involving malpractice by CU's engineers. This gap was partially filled by a separate Engineers Professional Liability Endorsement issued by Travelers ("Travelers EPL Endorsement"). The Travelers EPL Endorsement provided claims-based coverage.[3]

As the *Commercial Union I* panel noted, the Travelers Policy and the Travelers EPL Endorsement left CU with a gap in its coverage with respect to occurrences resulting from engineer malpractice for which no claim was filed during the policy period. Consequently, at the time of the explosion, CU also carried an umbrella policy issued by Weavers

---

1. American Employers is not a party to this case.

2. Occurrence-based insurance provides coverage if the act giving rise to the claim occurred during the policy period, regardless of when the claim is filed.

3. Claims-based insurance provides coverage for claims made during the policy period regardless of when the acts giving rise to the claims occurred.

("Weavers Umbrella").[4] Under the first section of the main body of the Weavers Umbrella, captioned "COVERAGE," the policy expressly covered "all sums ... imposed upon [CU] by law ... or assumed under contract or agreement ... for damages on account of ... personal injuries, property damage, [or] advertising liability ... arising out of each occurrence happening anywhere in the world."[5]

The next section of the main body of the Weavers Umbrella, captioned "LIMIT OF LIABILITY," provided that Weavers would only be liable for the ultimate net loss in excess of either "(a) the limits of the underlying insurances as set out in the attached schedule in respect of each occurrence covered by said underlying insurances" or "(b) $25,000 ultimate net loss in respect of each occurrence not covered by said underlying insurances'. . . ."

To the Weavers Umbrella was attached an EPL Endorsement ("Weavers EPL Endorsement"). The terms of the Weavers EPL Endorsement provided that it was to "include Engineers Professional Liability as more fully described in the underlying General Liability Policy/ies" (referencing the Travelers Policy) and that such coverage "is subject to the same warranties, terms and conditions ... as are contained in the said underlying policy/ies. . . ." The parties agree that because this language specifically incorporates the provisions of the Travelers EPL Endorsement, the Weavers EPL Endorsement provided claims-based coverage.

Subsection (a) of the Weavers EPL Endorsement captioned "LIMIT OF LIABILITY," provided that Weavers would only be liable for the ultimate net loss in excess of "[t]he limits of the underlying insurances as set out in the attached schedule in respect of

each occurrence covered by said underlying insurances." If the liability was not covered by another policy, subsection (b) of the Weavers EPL Endorsement ("Liability Amendment") provided coverage for "the excess of ... $25,000 ultimate nett [sic] loss in respect of each occurrence not covered by said underlying insurances but in respect of engineering services liability $250,000 ultimate nett [sic] loss [for] each occurrence not covered by said underlying insurances." In effect, subsection (b) provides for a deductible when the Umbrella "drops down" to provide coverage not covered under the underlying policy ("$250,000 deductible"). An attachment captioned "Schedule of Underlying Insurances" lists the Travelers Policy.

Initially, Travelers undertook the defense of the Peterson claims. Then, in 1982, CU determined that it had not made its claim for coverage during the Travelers Policy period. Accordingly, CU released Travelers from any further obligations in connection with the explosion. Weavers then informed CU that its Umbrella would not cover the Peterson claims. In November 1982, CU brought the present action, seeking a judicial declaration as to whether the Weavers Umbrella covered the Peterson claims.

Following extensive discovery, both parties sought summary judgment. CU argued that the main body of the Weavers Umbrella covered EPL claims on an occurrence basis and that the Weavers EPL Endorsement provided additional coverage on a claims basis. Weavers argued that the Weavers EPL Endorsement was the sole source of EPL coverage and, because the EPL Endorsement was claims-based, there was, accordingly, no coverage under either the Weavers Umbrella or the Weavers EPL Endorsement. The district court largely adopted the latter reading

---

**4.** "Umbrella" policies differ from standard excess insurance policies in that they are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage). *Commercial Union I*, 7 F.3d at 1053. In the latter instance, the Umbrella is said to "drop down" to provide primary coverage where the underlying policy provides no coverage at all.

**5.** Under the Weavers policy, the term "occurrence" was defined as follows:

The term "Occurrence" wherever used herein shall mean an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence.

and granted Weavers's motion for summary judgment.

On appeal, the *Commercial Union I* panel reversed. Interpreting the various policy provisions, the panel concluded that the main body of the Weavers Umbrella provided occurrence-based EPL coverage and thus covered the Peterson claims. *Commercial Union I*, 7 F.3d at 1049. Consequently, the panel ordered that the judgment in favor of Weavers be vacated and that judgment be entered for CU, in proceedings consistent with the panel's opinion. Weavers's petition for rehearing and rehearing en banc was denied.

In this appeal, we are asked to review issues arising from the subsequent proceedings before the district court. CU moved that the district court enter judgment for $1,502,874.30 plus interest[6] to be calculated at 12%, the prejudgment interest rate for contractual disputes under Massachusetts law. In its response, Weavers argued that the $1,502,874.30 was subject to the $250,000 deductible and that prejudgment interest should be determined by reference to federal law. As to the prejudgment-interest issue, Weavers argued in the alternative that if state law applied, the correct Massachusetts statute set the rate at 6%. The district court, finding that the *Commercial Union I* panel had "rested judgment upon" the validity of the $250,000 deductible, applied the deductible, ordered entry of judgment for CU in the amount of $1,252,874.30, found state law to govern interest, and ordered that prejudgment interest be calculated at the rate of 12%. The district court entered judgment for $2,749,326.48.

Pursuant to Fed.R.Civ.P. 59, both parties filed motions seeking to alter or amend the judgment. The district court denied both motions.[7] CU appealed, and Weavers cross appealed. CU requested that Weavers post a bond pursuant to Fed.R.Civ.P. 62. When Weavers refused, CU obtained an execution. CU then received payment from all defendants except Walbrook and Slater, Walker and has accepted checks totaling $2,314,758.61. CU refused to execute a satisfaction of judgment. Weavers moved to dismiss CU's appeal. The motion to dismiss was denied without prejudice pending reconsideration by this panel.

## II.

### DISCUSSION

■ Where, as here, the issues on appeal involve pure questions of law, our review is *de novo*.[8] *See, e.g., Villafane–Neriz v. Federal Deposit Ins. Corp.*, 20 F.3d 35, 39 (1st Cir.1994). On appeal, CU makes two principal arguments: (1) that the district court erred in stacking the $250,000 deductible on top of the payment received from American Employers; and (2) that Weavers waived its right to argue for alternate relief in application of the deductible. In its cross appeal, Weavers argues: (1) that the district court erred in applying state law to award prejudgment interest; and, in the alternative, (2) that, if state law applies, the district court applied the incorrect law. On its motion to dismiss CU's appeal, Weavers argues that, in executing the district court's judgment, CU waived its right to appeal. We first address Weavers's motion to dismiss, then CU's appeal and, finally, Weavers's cross appeal.

#### A. Weavers's Motion to Dismiss

■ In its motion to dismiss, Weavers argues that, because CU executed judgment

---

**6.** In its brief in *Commercial Union I*, CU explained: "Commercial Union . . . does not seek to hold Weavers liable for $2,227,874.30 [sic] ($2,502,874.30 [settlement and defense costs related to the Peterson claims] less the $250,000 retention). Commercial Union seeks to recover only the amount it is out of pocket caused by Weavers'[s] breach: $1,502,874.30 plus interest."

**7.** The judgment was amended by joint motion to correct technical errors.

**8.** We review the district court's decision to deny a motion to alter or amend a judgment for manifest abuse of discretion. *See, e.g., Jorge Rivera Surillo & Co. v. Falconer Glass Indus.*, 37 F.3d 25, 27 (1st Cir.1994). As our discussion below indicates, we find that the district court properly entered judgment and therefore did not abuse its discretion in denying the motions under Rule 59. Accordingly, we hold that the parties' cross-motions under Fed.R.Civ.P. 59 were properly denied.

against all defendants except Walbrook and Slater, Walker, CU has "accept[ed] the substantial benefits of a judgment, voluntarily and intentionally, and with knowledge of the facts," *Fidelcor Mortgage Corp. v. Insurance Co. of N. Am.*, 820 F.2d 367, 370 (11th Cir. 1987) (citations omitted), and therefore waived its right to appeal. CU argues that *Fidelcor*, on which Weavers principally relies, should be distinguished because in that case Fidelcor executed a satisfaction of judgment, whereas CU has refused to do so.

Our analysis must start with *United States v. Hougham*, 364 U.S. 310, 312, 81 S.Ct. 13, 15–16, 5 L.Ed.2d 8 (1960), in which the Supreme Court held that "where a judgment is appealed on the ground that the damages awarded are inadequate, acceptance of payment of the amount of the unsatisfactory judgment does not, standing alone, amount to an accord and satisfaction of the entire claim." Commentary has noted that the dimensions of the Court's holding are vague and courts of appeals have subsequently developed disparate "acceptance of benefits" doctrines. *See, e.g.,* 9 James W. Moore et al., *Moore's Federal Practice* ¶ 203.06 (2d ed. 1994) (hereinafter, *Moore's Federal Practice*); Benson K. Friedman, Note, *An Intent–Based Approach to the Acceptance of Benefits Doctrine in the Federal Courts*, 92 Mich.L.Rev. 742 (1993); Annotation, *Right to Appeal From Judgment As Affected By Acceptance of Benefit Thereunder—Federal Cases*, 5 L.Ed.2d 889 (1960). This Circuit has not explicitly addressed this issue since *Hougham*. Notably, in *Fidelcor*, the Eleventh Circuit does not discuss *Hougham*. Instead, *Fidelcor* relies on pre-*Hougham* common law that strictly applied the bar to appeal after acceptances of benefits, subject to only limited exceptions. We decline to follow this approach.

While the use of the phrase "standing alone" by the *Hougham* Court does lead to some uncertainty, we think that the unique circumstances presented here fit comfortably within the rule of that case. As discussed fully below, CU's appeal focuses on the district court's application of the $250,000 deductible. Weavers argued for the application of the deductible before the district court and, except for its challenge to the rate of prejudgment interest raised in its cross appeal, Weavers does not otherwise dispute the entry of judgment. Under these circumstances, we do not think that CU should be foreclosed from appealing the deductible issue simply because it collected payment on what was essentially an undisputed amount. Indeed, this case bears out the wisdom of the relative flexibility incorporated in the *Hougham* rule.[9] Accordingly, we deny Weavers's motion to dismiss.

## B. Commercial Union's Appeal

CU challenges the district court's interpretation of *Commercial Union I* and argues that the language of the Weavers Umbrella prohibits stacking the $250,000 deductible on top of the amount received from American Employers. Characterizing the deductible as "alternative relief," CU further argues that, because Weavers raised the application of the deductible only after *Commercial Union I*, the issue is waived. We address each argument in turn.

### 1. The $250,000 Deductible

The doctrine of the law of the case directs that a decision of an appellate court on an issue of law, unless vacated or set aside, governs the issue during all subsequent stages of litigation in the *nisi prius* court and thereafter on any further appeal. *United States v. Rivera–Martinez*, 931 F.2d 148 (1st Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 184, 116 L.Ed.2d 145 (1991). When a case is appealed and remanded:

"the decision of the appellate court establishes the law of the case and it must be followed by the trial court on remand. If there is an appeal from the judgment en-

---

9. We note that we would have reached the same result by applying the post-*Hougham* test adopted by at least four other circuits. Under this test, a party who accepts the benefit of a judgment is precluded from appealing if the circumstances indicate a mutual intent to settle all claims in dispute and thereby terminate the litigation. *See, e.g., Gadsden v. Fripp*, 330 F.2d 545, 548 (4th Cir.1964). As the discussion below amply illustrates, no such mutual intent exists in this case.

tered after remand, the decision of the first appeal establishes the law of the case to be followed on the second."

*Id.* (quoting 1B *Moore's Federal Practice* ¶ 0.404[1] (2d ed. 1991)). When the reviewing court, in its mandate, prescribes that a court shall proceed in accordance with the opinion of the reviewing court, it incorporates its opinion into its mandate. *Jones v. Lewis,* 957 F.2d 260, 262 (6th Cir.), *cert. denied,* ── U.S. ──, 113 S.Ct. 125, 121 L.Ed.2d 80 (1992). *Cf. Elias v. Ford Motor Co.,* 734 F.2d 463, 465 (1st Cir.1984) ("A mandate is completely controlling as to all matters before the appellate court and disposed of by its decree."); *accord Rivera–Martinez,* 931 F.2d at 150; *Federal Deposit Ins. Corp. v. Ramirez–Rivera,* 869 F.2d 624, 627 (1st Cir. 1989). The mandate constitutes the law of the case on such issues of law as were actually considered and decided by the appellate court, or as were necessarily inferred from the disposition on appeal. 1B *Moore's Federal Practice* ¶ 0.404[10] (2d ed. 1993).

■ In *Commercial Union I,* the mandate directed the district court to conduct further proceedings "in accordance" with the panel's opinion. The legal issue in *Commercial Union I* was whether the Weavers Umbrella provided occurrence-based coverage for the Peterson claims; resolution of that issue required the panel to interpret the Weavers contract. As noted above, the panel determined that the main body of the Weavers Umbrella provided coverage and that the Peterson claims resulted from an "occurrence" within the meaning of the policy's definition of that term. *Commercial Union I,* 7 F.3d at 1051. Importantly, the panel stated:

> Our integrated reading of the Weavers Umbrella policy as a whole is corroborated by the ·specific terms of the Liability Amendment, which contemplate "engineering services liability" subject to a $250,000 deductible, in circumstances where, as here, the Weavers Umbrella "drops down" to provide primary coverage of risks not covered by the underlying [Travelers] insurance policy. Thus, the Liability Amendment clearly replaces corresponding language in the "LIMIT OF LIABILITY"

section of the main body of the Weavers Umbrella. *We find untenable an interpretation which would provide a $250,000 EPL "deductible" for a risk not covered in the first place.*

*Id.* at 1053 (emphasis added). As the panel stated, its reading gave "full effect" to all terms in the main body of the Weavers Umbrella and the Weavers EPL Endorsement, thus satisfying the obligation to give reasonable effect to all contractual terms whenever possible. *Id.* at 1052 (citing *Jimenez v. Peninsular & Oriental Steam Nav. Co.,* 974 F.2d 221, 223 (1st Cir.1992); *Feinberg v. Insurance Co. of N. Am.,* 260 F.2d 523, 527 (1st Cir.1958) (applying Massachusetts law)).

CU argues, in essence, that the panel's references to the $250,000 deductible are *dicta* and thus cannot constitute law of the case. *See, e.g., Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 972 F.2d 453, 459 (1st Cir.1992) ("*Dictum* contained in an appellate court's opinion has no preclusive effect in subsequent proceedings in the same, or any other, case."). We do not agree with CU's argument. To resolve the legal issue presented in *Commercial Union I,* it was essential that the panel, to the extent possible, give reasonable effect to all contractual terms. As the language from the opinion quoted above suggests, giving full effect to the $250,000 deductible was an especially critical element in resolving the case. Simply stated, it was the key piece of the puzzle. The availability of the deductible lay at the heart of the integrated interpretation of the Weavers Umbrella and the Weavers EPL Endorsement. Moreover, the panel concluded that, because the Travelers Policy did not provide coverage for the Peterson claims, the Weavers Umbrella "dropped down" to provide coverage and, consequently, the $250,000 deductible applied. Therefore, the district court correctly interpreted the law of the case and we hold that the entry of judgment was in accordance with *Commercial Union I's* mandate.

■ Of course, the law of the case is a prudential doctrine and does not serve as an absolute bar to our reconsideration of an issue. *Rivera–Martinez,* 931 F.2d at 150–51. We do not reconsider a decision, however,

" 'unless the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice.' " *Id.* (quoting *White v. Murtha,* 377 F.2d 428, 432 (5th Cir.1967)). On this appeal, CU essentially argues that the third condition obtains; that is, the Weavers contract cannot be interpreted to permit application of the deductible to the American Employers indemnification obligation.

■ According to CU, the $250,000 deductible should not be stacked upon the American Employers indemnification because Travelers, and not American Employers, is listed on the "Schedule of Underlying Insurance" and the Weavers EPL Endorsement did not contain a reference to "other insurance not scheduled which may have been collectible by CU" to which the deductible would apply.

Any confusion on the reader's part is to be excused. After years of pointing to the deductible as prima facie evidence of Weavers's liability,[10] CU now argues that the $250,000 deductible should not apply. Based on the plain language of the Weavers contract, we cannot agree with CU's new argument. The Liability Amendment provides coverage for "each occurrence *not covered by said underlying insurances* [referencing the attached schedule]" subject, in the case of engineering services, to a $250,000 deductible. Both parties agree that the "attached schedule" refers only to the Travelers Policy. The Liability Amendment must be read to provide primary coverage, subject to the deductible, when the Travelers Policy does not provide coverage. As CU repeatedly argued, that is exactly what occurred in this case: the Weavers Umbrella "drops down" to provide coverage not covered by the Travelers Policy, and thus

the $250,000 deductible must apply. In short, the language of the contract requires application of the deductible. That Weavers may have included additional language in the insurance contract has no bearing on the outcome.

In *Commercial Union I,* CU offered a somewhat different explanation of the amount it is entitled to recover. Rather than arguing that the deductible did not apply because of the contractual language, CU expressly stated that it only sought to recover that amount for which it was "out of pocket," or $1,502,874.30 plus interest. Under CU's view, because its "out of pocket" figure already affords Weavers a $750,000 "savings" (ignoring interest) from its total potential exposure (amount of Peterson claims less deductible less "out of pocket" amount), they should not be entitled to the benefit of an additional $250,000 in "savings". Critically, however, there was never an agreement among the parties that the deductible would not still apply to whatever amount CU sought to recover. We can discern no basis in the contractual language to effect what would essentially be a "waiver" of the deductible. The fact that CU sought judgment for an amount less than it might otherwise be owed cannot obviate the plain language of a valid contractual provision. Indeed, given the course of this litigation, we find that the invitation to ignore the $250,000 deductible is, to say the least, ironic.

In sum, we find no error in the prior panel's interpretation of the contractual provisions or their application in this case. Accordingly, as to the deductibility issue, we hold that entry of judgment by the district court is unassailably proper.

### 2. *Waiver of the Deductibility Issue*

■ CU argues that, because Weavers failed to raise the application of the deduct-

---

**10.** For example, the *Commercial Union I* panel summarized CU's argument as follows:

> [O]n CU's reading, the Weavers EPL Endorsement extends claims-based coverage "for those EPL claims arising out of accidents or occurrences that took place prior to the Weavers Umbrella period where claim was made during the [Weavers] policy period itself." Furthermore, CU reasons, the language of the Liability Amendment (amending the "LIMIT OF LIA-

> BILITY" section so as to add a $250,000 "self-insured retention" for EPL) supports its claim that the main body of the Weavers Umbrella covers EPL. We think the plain language of the insurance contract as a whole, and the reasonable expectations of the parties, are effectuated under the interpretation urged by CU.

*Commercial Union I,* 7 F.3d at 1052.

ible until after the mandate had issued in *Commercial Union I,* the argument should be rejected as untimely. We do not agree. As the foregoing discussion indicates, there can hardly be any dispute that the deductible was a central focus of this lengthy case. It was the subject of intense review before the *Commercial Union I* panel. Given the pages of record devoted to the deductible, it would simply be untenable to find waiver had occurred with respect to that issue. We decline to do so and hold that there was no such waiver.

### C. Weavers's Cross Appeal

■ On its cross appeal, Weavers makes two alternative arguments: (1) that in diversity actions brought under the federal Declaratory Judgment Act, the determination of prejudgment interest is governed by federal law; and (2) that, if state law is to apply, the district court applied the wrong law. We address each argument in turn.

#### 1. Prejudgment Interest Under the Declaratory Judgment Act

In determining the rate of prejudgment interest, the district court held that, because jurisdiction was based on diversity, Massachusetts law governed. Weavers argues that federal law should govern. Reduced to its essence, Weavers's theory is that the "procedural" nature of the Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201 and 2202,[11] displaces a "contrary state provision" under the rule of *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and its progeny. Thus, Weavers argues that if the district court grants "[f]urther necessary or proper relief" under the DJA by awarding prejudgment interest, it should apply the federal rule governing prejudgment interest under which, Weavers says, prejudgment in-

terest is calculated at the "market" rate of interest. We find Weavers's analysis to be flawed.

Where, as in this case, jurisdiction is based on diversity, familiar principles control. "[F]ederal courts sitting in diversity jurisdiction are obligated to apply state law unless applicable federal procedural rules are sufficiently broad to control a particular issue before the court." *Daigle v. Maine Medical Ctr., Inc.,* 14 F.3d 684, 689 (1st Cir.1994) (citing *Walker v. Armco Steel Corp,* 446 U.S. 740, 749, 100 S.Ct. 1978, 1984–85, 64 L.Ed.2d 659 (1980); *Hanna v. Plumer,* 380 U.S. 460, 470–71, 85 S.Ct. 1136, 1143–44, 14 L.Ed.2d 8 (1965)); *see also Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 26, 108 S.Ct. 2239, 2242, 101 L.Ed.2d 22 (1988) (where federal procedural statute is involved, a court must determine if it is "sufficiently broad to control the issue").

■ The DJA creates a particular remedy where a federal district court already has jurisdiction to entertain a suit. *See, e.g., Nashoba Communications v. Town of Danvers,* 893 F.2d 435, 437 (1st Cir.1990). Issues that would be governed by state law in a coercive action are equally governed by state law when declaratory relief is sought. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,* § 2771 (2d ed. 1983) (hereinafter, "Wright, Miller, & Kane"). Indeed, as one commentator has noted:

Since the declaratory remedy is not intended to affect substantive rights, federal substantive rights will, of course, rule the adjudication of federal rights. Similarly, just as in any other type of civil action where the substantive issues are non-federal, *Erie R.R. v. Tompkins* requires a

---

**11.** Captioned "Creation of remedy," 28 U.S.C. § 2201 provides in relevant part:

In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (1988)

Captioned "Further relief," 28 U.S.C. § 2202 provides:

Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

28 U.S.C. § 2202 (1988)

careful and loyal application of state substantive law. . . .

6A *Moore's Federal Practice* ¶ 57.02[5] (2d ed. 1994).

 Notwithstanding these well-established principles governing both federal-state choice of law and declaratory judgment actions, Weavers argues, as summarized above, that federal law should govern prejudgment interest. In circumstances such as this where a federal court is confronted with a claim that a state law conflicts with a federal procedural rule or statute, the court must first ask whether the dispute falls within the scope of the federal statute. If a conflict exists, then the court must then ask whether the statute is a valid exercise of Congress's authority. *See, e.g., Stewart,* 487 U.S. at 26–27, 108 S.Ct. at 2242–43. If no federal statute or procedural rule covers the point in dispute, a court must then proceed to evaluate "whether application of federal judge-made law would disserve the so-called 'twin aims of the *Erie* rule: discouragement of forum shopping and inequitable administration of the laws.'" *Id.* at 27 n. 6, 108 S.Ct. at 2243 n. 6 (quoting *Hanna,* 380 U.S. at 468, 85 S.Ct. at 1142). If application of federal law would disserve these two policies, state law applies. *Id.*

We find that Weavers's theory fails on the first inquiry: no conflict exists between the "procedural" DJA [12] and state prejudgment interest law. Weavers reads the DJA broadly: under Weavers's interpretation, a federal court entertaining a declaratory judgment action may, in effect, apply a rule of decision [13] that would fashion "further relief" in a more restrictive manner than would apply in a non-declaratory diversity case. Thus, according to Weavers, a conflict with state law arises.[14]

The plain language of 28 U.S.C. §§ 2201 and 2202 does not support Weavers's broad reading. Section 2201 authorizes a judicial declaration "whether or not further relief is or could be sought," thus "indicat[ing] that declaratory relief is alternative or cumulative and not exclusive or extraordinary." Fed. R.Civ.P. 57 Committee Notes. Section 2202 gives effect to the cumulative nature of the declaratory device [15] by authorizing a district court to grant additional relief consistent with the underlying declaration even though the right to the relief may arise long after the court has entered its declaratory judgment. *See, e.g., Gant v. Grand Lodge,* 12 F.3d 998, 1002 (10th Cir.1993) (citing Wright, Miller, & Kane § 2771), *cert. denied,* —— U.S. ——, 114 S.Ct. 1834, 128 L.Ed.2d 462 (1994). The fact that a declaratory action was brought in lieu of an action seeking coercive relief "'does not merge a claim in the judgment or bar it.'" *Gant,* 12 F.3d at

12. As Weavers points out, courts and commentators have characterized the DJA as "procedural." *See, e.g., Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 878–79, 94 L.Ed. 1194 (1950) (" '[T]he operation of the Declaratory Judgment Act is procedural only.' . . . Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." (citation omitted) (*dicta*)); Charles A. Wright, *Law of Federal Courts* § 100 (5th ed. 1994) ("[The DJA] may be regarded as 'procedural' and is expressly authorized by Act of Congress."). For the purposes of addressing Weavers's argument only, we adopt this characterization.

13. When a district court sits in federal question jurisdiction, prejudgment interest has been determined by federal common law in the absence of a specific provision in the underlying statute. *See, e.g., Robinson v. Watts Detective Agency, Inc.,* 685 F.2d 729, 741 (1st Cir.1982), *certs. denied,* 459 U.S. 1105, 103 S.Ct. 728, 74 L.Ed.2d 953, 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436

(1983). Thus, Weavers appears to argue that federal common law should similarly apply in the context of a diversity-based declaratory judgment action. We note, however, that in at least one federal question case, we held that a district court may properly look to state law where the underlying federal law is silent as to awarding prejudgment interest. *Colon Velez v. Puerto Rico Marine Mgmt., Inc.,* 957 F.2d 933, 941 (1st Cir. 1992). Hence, we held that the district court did not abuse its discretion in levying prejudgment interest at the 12% rate applicable under local law. *Id.*

14. Notably, notwithstanding the long history of the DJA, Weavers does not point to a single case adopting its view.

15. On this point we also note that under Fed. R.Civ.P. 54(c), a court, in rendering judgment, may grant the prevailing party any relief to which that party is entitled, even if such relief was not, but could have been, demanded in the original pleadings. *See* 6A *Moore's Federal Practice* ¶ 57.10 (2d ed. 1994).

1002 (quoting 10A Wright, Miller, & Kane § 2771).

■ Simply stated, the DJA complements, but does not displace, relief available under applicable law. Accordingly, we do not share Weavers's view that the provision for district courts to grant "further necessary or proper relief" is an authorization to formulate a rule of decision granting less relief than would otherwise have been available had a coercive action been brought instead.[16]

■ Because no conflict exists between a specific federal rule or statute and state law, we then must determine whether application of a federal-judge made rule governing the calculation of prejudgment interest would disserve the twin aims of *Erie*. Assuming for the moment that a federal court would, as Weavers argues, calculate prejudgment interest according to the "market" rate, the difference between the application and non-application of a state law under which interest is calculated at 12% could make a substantial difference in terms of the plaintiff's ultimate monetary recover. Moreover, if the state law were not to apply, the incentives for forum shopping are plain. A plaintiff would likely bring his action in state court to take advantage of the more favorable prejudgment interest law; similarly, a non-Massachusetts defendant would seek to remove the action to avoid substantial additional damages. Because the twin aims of *Erie* would not be served by the application of judge-made federal law, state law must apply. Stated another way, prejudgment interest is substantive law and, therefore, state law must be applied in diversity-based proceedings. This conclusion comports with our repeated statements that when jurisdiction is diversity-based, a district court should look to the law which a state court sitting in that jurisdiction would apply in awarding prejudgment interest. *See, e.g., Aubin v. Fudala,* 782 F.2d 287, 289 (1st Cir.1986); *Roy v. Star Chopper, Inc.,* 584 F.2d 1124, 1135 (1st Cir. 1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979).

■ In sum, a district court sitting in diversity when it awards prejudgment interest pursuant to a declaratory judgment action must apply the law of the state in which the court sits, including that state's conflict-of-law principles. *See Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Here, the parties agree that Massachusetts law governs the substance of the underlying transaction. Under these circumstances, Massachusetts law directs that a court should apply Massachusetts law in calculating prejudgment interest. *See, e.g., Morris v. Watsco, Inc.,* 385 Mass. 672, 674–75, 433 N.E.2d 886 (1982). Thus, we hold that the district court properly calculated prejudgment interest using Massachusetts law.

### 2. *The Applicable Rate of Interest Under Massachusetts Law*

■ Weavers next argues that even if Massachusetts law is to govern the award of prejudgment interest, the district court erred in awarding prejudgment interest pursuant to Mass.Gen.L. ch. 231, § 6C [17] rather than under Mass.Gen.L. ch. 107, § 3.[18] Weavers

---

**16.** We note here that in *Gant* the Tenth Circuit reaffirmed an earlier holding interpreting section 2202 as authorizing a district court sitting in a diversity-based declaratory proceeding to grant *additional* relief, not otherwise authorized by state law, if that relief were " 'necessary or proper to effectuate relief based upon the declaratory judgment rendered in the proceeding.' " *Gant,* 12 F.3d at 1003 (quoting *Security Ins. Co. v. White,* 236 F.2d 215, 220 (10th Cir.1956)). We take no position on the Tenth Circuit's interpretation of the statute.

**17.** Captioned, "Interest added to damages in contract actions," Mass.Gen.L. ch. 231, § 6C provides in relevant part:

In all actions based on contractual obligations, upon a verdict, finding or order for judgment for pecuniary damages, interest shall be added by the clerk of the court to the amount of damages, at the contract rate, if established, or at the rate of twelve per cent per annum from the date of the breach or demand. If the date of the breach or demand is not established, interest shall be added by the clerk of the court, at such contractual rate, or at the rate of twelve per cent per annum from the date of the commencement of the action. . . .

Mass.Gen.L. ch. 231, § 6C (Supp.1993).

**18.** In relevant part, Mass.Gen.L. ch. 107, § 3 provides:

If there is no agreement or provision of law for a different rate, the interest of money shall be at the rate of six dollars on each hundred for a year. . . .

reasons that, because the Massachusetts declaratory judgment act, Mass.Gen.L. ch. 231A, does not specify the rate of interest to be awarded, there is no applicable "provision of law for a different rate" and, thus, chapter 107, section 3 is not supplanted. In essence, Weavers seeks to avoid application of section 6C by recharacterizing this case as a "declaratory judgment action." We decline to do so.[19]

■ As explained in detail above, the declaratory device is a remedy by which parties may seek a declaration as to their substantive rights. A declaratory judgment is not a theory of recovery. It is clear that, in this case, the underlying substantive theory is contractual. The plain language of chapter 231, section 6C establishes conclusively that it is to govern the award of prejudgment interest in contractual disputes. Accordingly, Weavers's reasoning must be rejected. The district court properly awarded interest under chapter 231A, section 6C.

### III.

### CONCLUSION

For the foregoing reasons, the motion to dismiss is denied and the decision of the district court is

*Affirmed. Each party shall bear its own costs.*

---

Mass.Gen.L. ch. 107, § 3 (1990)

**19.** Weavers makes two additional arguments against application of a 12% interest rate: (1) that the rate is "unreasonably high"; and (2) that the statute violates the Massachusetts Constitution because of changed economic conditions. Weavers's first contention is properly directed to the Massachusetts legislature. Whether Massachusetts should adopt a lower rate of interest or a scheme which refers to the "market" rate of interest is not a matter for a federal court to decide.

As for Weavers's second contention, we are at a loss to determine its theory for unconstitutionality. Indeed, Weavers does not point to a specific provision of the state constitution that the prejudgment interest rate is said to violate. Moreover, Weavers offers no developed argumentation on this point. We require far more, especially when we are asked to reach a state constitutional question. Accordingly, we deem this argument waived. *See, e.g., Ryan v. Royal Ins. Co. of Am.,* 916 F.2d 731, 734 (1st Cir.1990) ("issues adverted to on appeal in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned").